# MORRIS *v.* HITCHCOCK.

---

EQUITY PLEADING AND PRACTICE; INJUNCTIONS; IRREPARABLE DAMAGE; MULTIPLICITY OF SUITS; NECESSARY PARTIES; STATUTORY CONSTRUCTION; REPEAL BY IMPLICATION; INDIANS; INTRUDERS ON INDIAN LANDS, RIGHT OF REMOVAL OF; UNLAWFUL GRAZING OF LIVE STOCK ON INDIAN LAND; DEPARTMENTAL DISCRETION, JUDICIAL REVIEW OF; CHICKASAW NATION, TAXING POWERS OF; RESTRICTIONS ON ORDINARY TAXING POWERS; CONCLUSIONS OF LAW; TRIBAL ORGANIZATION OF CHICKASAW INDIANS; DEPARTMENTAL REGULATIONS.

1. A bill in equity by a large number of cattle and horse owners to enjoin the Secretary of the Interior, the commissioner of Indian Affairs, and officers acting under their authority from seizing, molesting, or removing the complainants' cattle and horses located in the Chickasaw Nation and grazing on lands held by individual Indians as their approximate shares upon allotment under contract with such Indians, for refusing to pay a tax upon such property imposed under an act of the legislature of that nation and departmental regulations in aid thereof, promulgated by the Secretary, and seeking to have the act and regulations declared void, is not demurrable on the ground that the complainants have an adequate remedy at law, but is maintainable, assuming the invalidity of the threatened interference, on the ground that such interference might cause irreparable damage, and, also, because a multiplicity of suits might be prevented by equity taking jurisdiction.

2. The Chickasaw Nation is not an indispensable party to such a suit; *construing* Sec. 2 of the act of Congress of June 28, 1898, providing that any Indian tribe affected by any suit pending in the United States court in any district in said territory shall be made a party thereto, and *holding* that even if such section applies to proceedings in any other than the district courts within the

territory, it governs in those cases only where the title to prop-
erty claimed by the tribe is involved, and that the tax on cattle
and horses involved in such a suit is not the property of the
tribe within the meaning of the statute.

3. While many of the provisions of the " Trade and Intercourse " laws
contained in Title XXVIII, R. S. U. S., being inconsistent with
subsequent legislation enacted to meet changed conditions in the
Indian Territory, are to be regarded as repealed by implication,
Sec. 2117, embodied in that title, prescribing a penalty for driv-
ing stock to graze upon the lands of an Indian tribe without its
consent; Sec. 2118, fixing a penalty for settlement on Indian
lands and the removal of settlers by the use of the military force
of the United States when necessary; Sec. 2147, authorizing the
superintendent of Indian affairs and Indian agents to remove in-
truders by force, and Sec. 2149, authorizing and directing the Com-
missioner of Indian Affairs, with the approval of the Secretary of
the Interior, to remove any intruder from any tribal reservation,
in the discretion of the Commissioner, not being inconsistent with
any subsequent legislation or inapplicable to conditions existing in
the Chickasaw Nation, are in force there.

4. Repeal by implication is not favored, and to work such repeal, the
repugnancy between the two statutes, in relation to a particular
subject-matter, must be so clear as to admit of no other reason-
able construction.

5. The right of the United States authorities to remove the owner of
property from an Indian reservation because his presence has
become detrimental to the peace and welfare of the Indians, in-
cludes the right to remove his property also; *construing* R. S.
U. S., Secs. 2117, 2118, 2147, and 2149.

6. The State of Arkansas being contiguous to the Indian Territory
and her laws having been adopted for the government of the
latter, the decisions of her Supreme Court, like those of the
Court of Appeals of the Indian Territory, interpreting the laws
relating to the guardianship and protection of the Indians, are
entitled to more than ordinary weight.

7. If the unlawful grazing of cattle within the limits of the Chickasaw
Nation is in the judgment of the Commissioner of Indian Affairs
detrimental to the peace and welfare of the Indians, it con-
stitutes a nuisance, which if it cannot be abated by the removal
of the owners from the nation because of their nonresidence, may
be abated by the removal of the cattle, the *gravamen* of the
nuisance being the grazing of the cattle whether they are con-
trolled by the owners in person, or through agents who may be
members of the tribe or otherwise entitled to reside within the
boundaries of the nation.

8. The exercise of the discretion of the executive officers of the United States in such a case, is not subject to judicial review in a proceeding against them by the cattle-owners to enjoin the removal of the cattle; especially where the Indians, through their legislature, have imposed a tax upon the cattle, which has been approved by the United States authorities, and the threatened removal is for refusal to pay such tax.

9. Whether the act of the legislature of the Chickasaw Nation of May 3, 1902, providing for the payment of an annual privilege or permit tax on live stock in the nation, owned by noncitizens, to be collected under regulations to be prescribed by the Secretary of the Interior, and declaring that if such tax is not paid on demand the presence of such live stock and the owners thereof shall be deemed detrimental to the peace and welfare of the Chickasaw Indians,— is to be construed as imposing a charge which is to be regarded as a condition of the admission of live stock to graze upon the Indian lands (which construction is favored by this court) or is to be construed as imposing a regular tax upon such property, the act was within the legislative powers of the Chickasaw Nation under existing treaties with it and Congressional legislation relating to Indian affairs.

10. Where a restriction upon the exercise of the ordinary power of taxation by a recognized government, is claimed under the stipulations of a treaty with another, whether the former be dependent upon the latter or not, its existence ought to appear beyond a reasonable doubt.

11. No restriction upon the ordinary taxing power of the Chickasaw Nation is contained in the clause of Article 7 of the Treaty of 1855 with the Indians of that nation, which excepts white persons from the recognition therein of the unrestricted right of self-government by that nation, and its full jurisdiction over persons and property within its limits.

12. An allegation in a bill in equity by live-stock owners to enjoin the Secretary of the Interior and other government officials, from removing the live stock of the complainants from the Chickasaw Nation, that there is not and has not been for four years any public domain of that nation, but that practically all of the land in that nation is now inclosed, claimed, and occupied by individual members of the nation as their approximate shares upon allotment, by reason of which the nation has no longer any jurisdiction over such land, states a conclusion of law, which is not admitted by a demurrer to the bill.

13. As long as the tribal government of the Chickasaw Indians shall exist with the modified powers of government recognized by the act of Congress of June 28, 1898, known as the "Curtis" act,

as amended by the act of July 1, 1902, the provisions of the Revised Statutes of the United States looking to the protection of the Indians from intruders upon their lands, will remain in full force; and the power conferred upon individual Indians of leasing their several proportions of the tribal lands, must be exercised in subordination to those laws, and subject to the remaining governmental powers of the nation, including the power, subject to the approval of the President, to impose conditions upon the entry of unauthorized persons, and the power to impose taxes by way of condition, or license, or upon property generally.

14. The Secretary of the Interior had the right to make and has the power to enforce departmental regulations to carry into effect the act of May 3, 1902, of the legislature of the Chickasaw Nation, approved by the President, imposing a tax upon the live stock of noncitizens of that nation, and to remove from the nation the live stock and its owners upon the refusal of the latter to pay the tax.

No. 1273.  Submitted March 13, 1903.  Decided April 7, 1903.

HEARING on an appeal by the complainants from a decree of the Supreme Court of the District of Columbia, sustaining a demurrer to and dismissing a bill in equity to enjoin the Secretary of the Interior, the Commissioner of Indian Affairs and others.                                   *Affirmed.*

The COURT in the opinion stated the case as follows:

This is an appeal from a decree of the Supreme Court of the District of Columbia sustaining a demurrer to, and dismissing a bill praying an injunction to restrain Ethan A. Hitchcock, the Secretary of the Interior, William A. Jones, Commissioner of Indian Affairs, and J. George Wright, Indian Inspector, and J. Blair Shoenfelt, Indian Agent, officers acting under their authority, from seizing, and removing from lands in the Indian Territory occupied by the Chickasaw Indian Nation, certain cattle belonging to the complainants.

As stated in the bill, the complainants, Edwin T. Morris, Edlar B. Blanton, William G. Maxwell, Phillip S. Witherspoon, Isaac H. Harness, Thomas Peery, R. L. Glover, J. B. Spragins, C. M. Keyes, and Milton F. Ikard are all citizens

of the United States, residing in Texas, Missouri and the
Chickasaw Nation, and no one of them is a member of any
of the Indian tribes.   The case made by the bill is fairly
stated in the brief of the appellants as follows:

The bill alleges that each of the complainants is the owner
of not less than five hundred head of cattle and horses, and
some of them owning more than a thousand head each, all of
which are located and grazing upon land in the Chickasaw
Nation, which land is and has been held, used and claimed by
individual Indians of said nation as their approximate shares
upon allotment; that their said cattle are grazing upon said
land under contract with said individual Indians, and upon
terms satisfactory to such Indians; that most of their cattle
and horses were bred and raised in said nation, and have
never been elsewhere; that many of them were acquired by the
complainants by purchase from individual members of the
Chickasaw Nation.   Some of said cattle and horses have been
introduced into the territory of said nation during the year
1902, and there are now more than one hundred thousand
such cattle and horses located in the territory of said nation
owned and held by citizens of the United States not members
of said Chickasaw Nation, upon like terms and conditions as
the cattle and horses of the complainants, and said cattle and
horses exceed in value the sum of fifteen ($15) dollars per
head.   The bill further alleges that there is not now, and for
four years there has not been any public domain in said
nation, but practically all of the land therein has been and is
now inclosed, claimed and occupied by individual members of
said nation, as their approximate shares upon allotment, and
over such lands so inclosed and held, the tribe or nation is
and has been without jurisdiction or control.   The bill further
alleges the enactment on May 3, 1902, by the legislature of
said Chickasaw Nation, of the act found on page 6 of the
record, whereby said legislature sought to impose an annual
tax of twenty-five cents per head upon all cattle and horses in
said nation, not belonging to members thereof.   That there-
after, and on June 3, 1902, the acting Secretary of the In-
terior, in aid of said statute, promulgated certain regulations,

found on pages 6 and 7 of the record. That the tax thus sought to be imposed the complainants and other citizens of the United States have refused and still refuse to pay, because they believe the same to be illegal and unauthorized. The bill further alleges the belief of the complainants that said Chickasaw legislature had no power or authority to enact any such statute as that cited, and that the Secretary of the Interior had no power or authority to promulgate and enforce any such regulations as those cited, and that the statute and the regulations are, in the belief of the complainants, null and void, and cannot be invoked as a justification for the threatened seizure of the cattle and horses of said complainants and other citizens of the United States, as set forth in the bill of complaint. The bill further alleges that the enforcement of said statute and regulations would not only result in a multiplicity of suits and almost endless litigation, but would injure the said cattle and horses of the complainants and other citizens of the United States, deprive them of water and grass, and throw them upon the hands of their owners at a time when they have no means of caring for them or providing them with feed or pasture, thereby compelling the owners to dispose of said cattle and horses at a ruinous sacrifice, and at a time when they are not in a condition to be marketed, and when there is little or no demand therefor, whereby the complainants and other citizens of the United States would suffer irreparable loss and damage, for which they have no adequate remedy at law.

The threatened action of the Secretary and his subordinates, complained of in the bill, are founded on the following act of the legislature of the Chickasaw Nation, passed May 3, 1902:

"An act to prescribe privilege or permit taxes and defining the manner of their collection.

" Be it enacted by the legislature of the Chickasaw Nation:

" Section 1. That there shall be paid upon live stock owned or held by noncitizens within the limits of the Chickasaw nation, an annual privilege or permit tax as follows: On cattle, horses and mules, twenty-five cents per head; and on

sheep and goats, five cents per head: *Provided,* that there shall be exempted from the provisions of this act, when owned and used by the head of a family, two cows and calves, and one team, consisting of two horses or two mules, or one horse and one mule; and the provisions of this act shall also apply to all live stock introduced into the Chickasaw nation since January 1, 1902, upon which the tribal taxes imposed by the laws of the Chickasaw nation have not been paid, with like force and effect as if such cattle had been owned and held within the limits of Chickasaw nation for one year prior to the passage and approval of this act.

" Sec. 2. That such privilege or permit taxes shall hereafter be payable to such person or persons, and collected under such rules and regulat'ons as may be prescribed by the Secretary of the Interior.

" Sec. 3. That the expenses of collecting such privilege or permit taxes shall be deducted from the gross collections, and the balance paid quarterly into the treasury of the Chickasaw nation.

" Sec. 4. That such privilege of permit taxes shall be due and payable annually, upon demand, and if such taxes are not paid when demanded, the live stock upon which such taxes are due, shall be held to be in the Chickasaw nation without its consent, and unlawfully upon the lands of the Chickasaws, and the presence of such live stock, and owners or holders thereof, within the limits of said nation, shall be deemed detrimental to the peace and welfare of the Chickasaw Indians.

" Sec. 5. That all acts or parts of acts in conflict herewith, be and the same are, hereby repealed; and this act shall take effect from and after its approval by the President of the United States."

The foregoing enactment was submitted to, and approved by the President of the United States, on May 15, 1902, under the authority of section 29 of the act of Congress approved June 28, 1898, and commonly called the " Curtis " bill (30 Stat. 495), which is in the following language:

" It is further agreed that no act, ordinance or resolution

of the council of either the Choctaw or Chickasaw tribes, in any manner affecting the land of the tribe, or of the individuals, after allotment, or the moneys or other property of the tribe or citizens thereof (except appropriations for the regular and necessary expenses of the government of the respective tribes), or the rights of any persons to employ any kind of labor; or the rights of any persons who have taken or may take the oath of allegiance to the United States, shall be of any validity until approved by the President of the United States. When such acts, ordinances, or resolutions passed by the councils of either of said tribes shall be approved by the governor thereof, then it shall be the duty of the national secretary of said tribe to forward them to the President of the United States, duly certified and sealed, who shall, within thirty days after their reception, approve or disapprove the same — said acts, ordinances, or resolutions, when so approved, shall be published in at least two newspapers having a *bona fide* circulation in the tribe to be affected thereby, and when disapproved shall be returned to the tribe enacting the same.

" It is further agreed, in view of the modification of legislative authority and judicial jurisdiction herein provided, and the necessity of the continuance of the tribal governments so modified, in order to carry out the requirements of this agreement, that the same shall continue for a period of eight years from the fourth day of March, eighteen hundred and ninety-eight."

On June 3, 1902, the Secretary of the Interior promulgated regulations looking to the collection of the permit tax aforesaid. These require the tax to be paid on January 1, of each year, or prior to the introduction of the stock, with description of the number, brands, etc., of said stock under oath, and as to all stock then in the territory, within ten days after notice given. If taxes are not paid within this time all stock found within the limits of the Chickasaw nation will be considered as unlawfully there, and measures will be taken to remove them, together with their owners and holders, without further notice.

*Mr. Jackson H. Ralston, Mr. Frederick L. Siddons* and *Messrs. Davis & Garnett* for the appellants:

1. The questions presented by the record in this case are of great importance, not only to the appellants and to all other citizens of the United States similarly situated, or who may be engaged in business in any portion of the Indian Tterritory, but also to the executive arm of the Government, particularly that portion which is charged with the administration of Indian affairs.

In this territory five Indian tribes or nations, known as the " Five Civilized Tribes," have their local governments and homes. These tribes are the Cherokees, Choctaws, Creeks, Seminoles, and Chickasaws, the latter being the nation or tribe with whom we are immediately concerned. According to the last census, the total white population of the Indian Territory, meaning thereby white persons not members of any of the Indian tribes or nations therein, is *in excess of six hundred thousand persons.* The total Indian population of said territory, both members of said tribes or nations, and those not members, is *less than seventy thousand.* In the Chickasaw Nation alone, according to said census, there are *more than one hundred and thirty thousand white persons,* not members of that nation or any of the others, and between *seven and eight thousand Indians.* The white population tends constantly to increase, while the reverse is true of the Indian population. White persons have entered this territory with the tacit, if not the express consent, both of the said various Indian nations and of the Federal authorities in charge of Indian affairs. They have built their homes, entered into various trades, businesses, and professions; are, in the main, on the most friendly terms with their Indian neighbors, many of them in intimate personal and business relations with the Indians, and not an inconsiderable number of whites have married into Indian families. The Indians and whites sit together on grand and petit juries, and compete for appointment to the various United States offices in the territory to be filled by the Presi-

dent of the United States. All of the Indians in said territory are now, by an express act of Congress, to be hereafter referred to, also citizens of the United States. Cities and towns have been incorporated in said territory, and municipal governments and free public schools are maintained therein. Foreign corporations do business in the Chickasaw Nation by complying with the simple requirement of an act of Congress (31 Stat. at L. 795). The inhabitants of the Chickasaw Nation, white and Indian, are permitted to and do incorporate for the purpose of engaging in any manufacturing, mechanical, mining, or other lawful business. Mansfield's Digest, Sec. 960; 31 Stat. at L. 794. They may also incorporate companies for the purpose of maintaining public bridges, turnpikes and the like, and none of the incorporators need be Indians. Mansfield's Digest, Secs. 504 to 509. The inhabitants of the territory may also incorporate companies to construct, own and operate electric railroads, telephone and telegraph lines. 31 Stat. at L. 795. Any bank or trust. company organized under the laws of Arkansas or any other State may transact a banking or trust company business in the Chickasaw Nation. 31 Stat. at L. 795, Sec. 8.

Under what is known as the " Curtis " bill, an act of Congress hereafter to be more fully discussed, the inhabitants of any town in the Chickasaw Nation, having two hundred or more inhabitants, *none of whom need be Indians,* may incorporate for municipal purposes, and in such towns, all men, without regard to race, are entitled to equal rights, privileges and protection. Under this same act of Congress, the land formerly belonging to the nations in said territory — tribal lands — is rapidly being divided up and allotted to the individual Indians; most of whom have, however, for some years enjoyed a practically exclusive and several possession and occupancy of a certain amount of land.

And, finally, it is a matter of public knowledge that there is pending in Congress a measure to admit this territory into the Union as a State.

From this hasty review of conditions in the territory, it will be seen that the civilization of its inhabitants measures

up to that of most of the later western States and other territories. And why should it not? The white persons there predominate in the proportion of more than eight to each Indian, and even the Indians themselves have long been recognized by this Government as civilized.

In this situation of affairs, it is contended by the appellees that on May 3, 1902, the Chickasaw Nation had power and authority to enact the law complained of. This we deny.

2. The Chickasaw Nation had no right, power or authority to enact the law in question, because that nation never had any legislative or governmental power or authority over white persons, not members of the nation; certainly it never had any taxing power over them.

The history of the relation of the United States Government to the Indian tribes and nations shows that from the beginning of our Government, up to within comparatively recent years, its policy, steadily maintained, was to segregate the Indians in certain portions of the country set apart for the purpose. So segregated, the Government permitted the Indians to establish and maintain their local governments, but these governments, while enjoying the ordinary powers of a municipal and territorial government, never were permitted to exercise any power or authority over white persons, not members of such tribes or nations. This is seen by legal opinions, by the provisions of treaties negotiated with the Chickasaw Nation, and by the course of Congressional legislation. *Cherokee Nation* v. *Railroad Co.,* 135 U. S. 641; *Cherokee Nation* v. *Georgia,* 5 Pet. 1, 17; *Ex parte Crow Dog,* 109 U. S. 556; *Talton* v. *Mayes,* 163 U. S. 376; 1 Opinions Attorney-General, 645. And the United States Government has refused to allow the Indian governments to exercise any governmental power over white persons, not members of the tribes or nations. See Treaty with Chickasaws of October 20, 1832, 7 Stat. at L. 381; treaty with same and Choctaws of June 22, 1855, 11 Stat. at L. 611; treaty with same tribes of April 28, 1866, 14 Stat. at L. 769 *et seq.*

No further treaties were ever negotiated with the Chickasaw. R. S. U. S., Sec. 2079.

It is not alone in the provisions of the treaties to which we have called attention that evidence is found of the limited character of the Indian governments. Congress, by a series of enactments, has still further deprived these governments of many of the most important governmental powers. Act of Congress of March, 1871 (R. S. U. S., Sec. 2079), which declared that thenceforth the Indian nations should not be recognized as independent nations or tribes or powers with which the United States should contract by treaty. And from that time the policy of the United States Government toward the Indians has undergone the most radical change. From a policy that segregated the Indians to certain portions of the country and permitted them to maintain their own tribal governments therein, and to hold their land in communal title, protecting them meanwhile from all outside aggression and interference, it adopted a policy of interfering more and more with the Indian governments, and finally entered upon the task of extinguishing the tribal governments and relations and of incorporating the Indians themselves into the body of American citizenship. See 24 Stat. at L. 388 (1887); vol. 1, Supplement Revised Statutes, 670 (1899); vol. 2, Supplement Revised Statutes, 392 (1895); 30 Stat. at L. 83 (1897); " Curtis Law " (1898); 30 Stat. at L. 495 *et seq.*

As the result of these various Congressional enactments, whatever powers the Indian governments formerly had, it is clear that they have been emasculated in a manner that leaves little of sovereign character to them. They have no judicial system of their own, and the courts that have taken the place of the old Indian or tribal courts are expressly forbidden to enforce any Indian statute or law. They have no power or authority over the cities or towns that may be incorporated in their territory. They are not permitted to legislate on the subject of the liquor traffic, and what is left of the Indian governments ceases to exist a little more than three years from this time. While the above-mentioned Curtis law declared that the Indians in the Indian Territory would become citizens of the United States upon the extinction of their

tribal governments, Congress changed its mind on the subject, and by an act approved March 3, 1901 (31 Stat. at L. 1447), it made all Indians in the Indian Territory citizens of the United States, from the date of the approval of the law. If the contention of the appellees is sound, we have this remarkable condition of affairs in the Chickasaw Nation: Some six or seven thousand citizens of the United States exercising, as must be conceded, the most limited form of local self-government, may enact a law imposing a discriminating tax upon the property of upwards of one hundred and thirty thousand more citizens of the United States, who have been permitted, both by the Indians and by the United States Government, to take up their residence within the boundaries of the Chickasaw Nation, purchase property therein, or bring it into the territory with them, and yet have no voice in the government that assumes to possess this power over them. We submit that before a law of such a character, enacted under such circumstances, is upheld, the courts should be astute to find that the power to enact it very clearly exists. See Cooley's Principles of Constitutional Law; *Cherokee Nation* v. *Railroad Co.,* 135 U. S. 641 *et seq.*

But it is claimed by the appellees that even if the Chickasaw Nation does not possess jurisdiction over persons and their property, not citizens or members of the tribe, it can, under the second exception found in article 7 of the Treaty of 1855, accord such persons permission to reside within its territorial limits, with the assent of the United States Agent, and that having this power, it may in its exercise annex conditions of such residence, and that the statute under consideration is the method employed by the nation of imposing conditions.

The contention is not sound for several reasons:

*First:* It amounts to saying that the correct construction of article 7 of the Treaty of 1855 is this: The Chickasaw Nation cannot exercise jurisdiction over persons and their property, not members or citizens of the nation, *unless such* persons, with its permission and that of the United States Agent, reside within its territorial limits. To so construe it

is to rob the first exception of the article of all meaning and force. Certainly this will not be done.

Now, what is the meaning of the article from a fair reading thereof? Is it not that the Chickasaw were to be permitted to maintain a government *of themselves,* by themselves, and for themselves; that they were to have no jurisdiction — no governmental power or authority — over persons not citizens or members of their nation, but they could, if they wished, with the assent of the United States Agent, permit such persons to reside in their country without becoming subject to the governmental jurisdiction of the nation? The correctness of this view of the article finds further support in the undertaking of the United States Government to expel all persons found within the limits of the nation who were not citizens or members thereof, and who had not the permission of the nation and the United States Agent to reside therein. Again, in article 14 of the same treaty, we find the United States Government's pledge to protect the Chickasaw " from aggression by  *   *   * *white persons not subject to their jurisdiction and laws."* What does this imply if not that these Indians had no jurisdiction over white persons, and that such persons were not subject to their laws.

The Treaty of 1866 re-enforces this contention.

*Second:* The law itself does not purport to impose conditions of residence within the Chickasaw country or in any manner attempt to regulate residence therein. While it is entitled "An act to prescribe privilege or permit taxes and defining the manner of their collection," it contains no provision for the issuance of permits, nor does it prohibit the coming or taking into the territory of the cattle and stock, subject to the tax, unless it is first paid. In fact, as alleged in the bill of complaint and admitted by the demurrer, the bulk of the cattle and horses owned by the appellants were bred and raised in the Chickasaw Nation and have never been elsewhere, and many of them were acquired by the appellants by purchase from members of said nation.

*Third:* The statute is plainly a revenue measure seeking to

impose a tax on certain specified personal property of non-citizens. It is true that the tax is called a privilege or permit tax, and that the penalty for its nonpayment is that the live stock and its owners are declared then to be in the Chicka-saw Nation without its consent, and their presence therein is deemed detrimental to the peace and welfare of the Chicka-saw Indians. Certainly this tax cannot be regarded as within the generally accepted definition of a privilege or permit tax. See 1 Desty on Taxation, 301.

Finally, we insist that on constitutional grounds this In-dian nation could not be held to possess the power claimed for it by the appellees. The power claimed is, in effect, one that in a very vital way affects the intercourse with the Indians. And that is a subject that is left to the Congress *exclusively* to regulate — Paragraph III, Sec. 8, Art. 1, Constitution. This power of regulation the legislature could not delegate even if it had attempted to do so.

Congress in the exercise of its exclusive power to regulate commerce with the Indians had the right to enact Section 2117, Revised Statutes, and provide that if a white man drove a stock of cattle and horses to graze upon Indian lands he should incur a penalty of $1 per head, to be recovered in an action for debt. *The Chickasaw cannot repeal, add to or take from this law,* for they are without jurisdiction in the premises. If the Chickasaw should attempt to make such an act a felony punishable in their courts, could any one be found foolish enough to contend that the law would be valid? This statute of May 3, 1902, depends upon the power of taxation, which is an incident of sovereigntiy, and belongs alone to the sovereign power. If the Chickasaw Indians do not have legislative dominion of the white man, they have no right to tax him or his property, and it is usurpation on their part to attempt to do so. It does not stand to reason that 5 per cent. of the population of the Chickasaw Nation can meet and impose taxes and burdens as they see fit upon the 95 per cent. who were not represented, and at the same time exempt themselves from any part of the burden, while they appropriate the exclusive benefits to themselves. If the

Chickasaw have this power, how is it derived? Certainly not from the treaties which give them a right to govern themselves, but *not* the right to govern those who are not members of the tribe. Certainly not from any supposed right to regulate commerce, for that belongs exclusively to Congress. If the Chickasaw need money, why do they not tax their own members, over whom they have jurisdiction? Why should the Interior Department encourage improvidence and dependence in the Chickasaw Indians by encouraging them in these efforts to put their hands in the pockets of their white neighbors? Under what provision of law or treaty does the Indian acquire the right to tax the white man for the benefit of the Indians?

3. Even assuming that the Chickasaw Indian Nation possessed the power and authority to enact a law imposing a discriminating tax upon noncitizens of the nation, nevertheless, in the case of the statute under consideration, the power has been invalidly exercised. The law is invalid for its many manifest uncertainties. It fixes no time or place when and where the tax attempted to be levied is to be paid; it provides no instrumentalities for the execution of the law, except by the attempt in section 2 to confer authority on the Secretary of the Interior to promulgate rules and regulations for the collection of the tax. It provides no penalty for the failure to pay the taxes, unless the declaration in section 4, that if said taxes are not paid the live stock subject to them shall be held to be in the territory of the nation without its consent, and unlawfully on the lands of the Chickasaw Indians, and the presence of such cattle shall be deemed detrimental to the peace and welfare of said Indians, is to be regarded as a penalty. The Secretary of the Interior is an officer of the United States Government, his office being created by Congress. His duties are such as Congress may prescribe, and he must, of course, also carry out the administrative directions of the President. Neither an Indian nation or any other nation, except that of the United States, could impose any other duties upon this official; hence the attempt of the Chickasaw Nation to make him its revenue

collector is simply a void act, to which no vitality is given by the Secretary's willingness to assume the duties thus imposed.

4. Even if the Chickasaw Nation had power and authority to enact the law under consideration and that it is operative and effective, nevertheless the regulations of the Secretary of the Interior, promulgated by him in pursuance of said law, and of which we complain, are void. The regulations *add* to the law provisions neither expressly nor by necessary implication to be found in the statute. Such provisions are void, because their promulgation is an attempted exercise of *legislative power or authority,* that it needs no citation of judicial opinion to show the Secretary does not possess. It is an attempt on his part not only to formulate and proclaim regulations *in aid* of a statute *but to enact a law.* See Secs. 1, 4, 5, and 6 of the Regulations; *Buster & Jones* v. *Wright,* 69 S. W. Rep. 882. It will no doubt be urged by counsel for the appellees that quite independent of this Indian law the Secretary of the Interior had the power to make the regulations in question. We protest that they should not be permitted to take this position, for the Secretary in publishing his regulations states that they are promulgated *in pursuance of this very law.* It, together with section 29 of the " Curtis " law, is the claimed source of his authority in this matter. He should not now be allowed to say, " I made a mistake in stating the sources of my authority. They are something very different. I really got my authority from the old Trade and Intercourse laws." As to the President's supposed power in the premises, we submit that he has none. If the law is a valid exercise of a governmental power possessed by the Chickasaw Nation, then in the absence of authority conferred upon him by Congress neither the President's approval nor his disapproval can give to or take away from the law any vitality whatsoever. *United States* v. *Lee,* 106 U. S. 196.

Irrespective, however, of the Indian statute, section 29 of the Curtis Law, and the Trade and Intercourse laws, the Secretary of the Interior has no authority to promulgate the regulations in question. Under no existing provisions of law

does he possess the authority to levy a tax.   Cooley Prin.
Const. Law, 111; *Stoutenburgh* v. *Hennick,* 129 U. S. 141;
*Field* v. *Clark,* 143 U. S. 649; *United States* v. *Eaton,* 144
U. S. 677. Lord Camden, in *Entick* v. *Carrington,* 19 How-
ell's State Trials.   According to the decision of the Court of
Appeals for the Indian Territory in *Maxey* v. *Wright,* 54
S. W. Rep. 807, the Secretary of the Interior does possess this
remarkable power, but the judge who delivered the opinion in
the subsequent case of *Buster & Jones* v. *Wright,* 69 S. W.
Rep. 882, held that the Secretary of the Interior is without
power to seize or molest property for the nonpayment of the
so-called tribal taxes.   He, in substance, held the same in
*Kelley* v. *Churchill,* 69 S. W. Rep. 817.

*Maxey* v. *Wright* is an unfortunate, ill-considered case, that
the courts will be forced to disregard.   It is impossible to
sustain it upon principle.

But assuming for the moment that the Secretary of the
Interior possesses the taxing power, in the exercise of it in
this case he has produced a measure fatally defective in an-
other vital particular. In the enforcement of the penalty that
he attempts to impose he provides for no notice to the owner
of the cattle subject to the tax of an intention to seize and
expel them.   Indeed, the regulations provide for the removal
of the cattle " without further notice."   See *Chauvin* v. *Vali-
ton,* 8 Mont. 451; *Myers* v. *Shields,* 6 Fed. Rep. 717, 729.

5. What are known as the " Trade and Intercourse " laws,
as contained in sections 2111–2157, Revised Statutes of
United States, are not in force in the Chickasaw Nation, be-
cause inapplicable to conditions existing there and incon-
sistent with subsequent legislation.   But even if in force they
do not confer authority upon the Secretary of the Interior
to make and enforce the objectionable regulations.

The original Intercourse Act of June 30, 1834, was in-
tended to apply to what was deemed the Indian country.
This Indian country was defined by the first section of the
act to be that part of the United States west of the Missis-
sippi, and not within the States of Missouri and Louisiana
or the Territory of Arkansas, and also that part of the United

States east of the Mississippi river, and not within any State to which the Indian title had not been extinguished. This definition of Indian country was afterward repealed, and it was left for the courts to say what is, or is not, Indian country, as applicable to individual cases whenever they might arise. It is evident that this statute was intended to apply to a country almost exclusively inhabited by Indians, and where they had but limited intercourse with white people. *United States* v. *Cisna,* 1 McLean, 254, and *Benson* v. *United State,* 44 Fed. Rep. 178. Radical changes have taken place in what is known as the Chickasaw Nation since that date. Yet the Interior Department does not seem to realize that the country has progressed, and the officers of that department profess to believe that this old Intercourse Law of June 30, 1834, is strictly in force in the Chickasaw Nation. Under section 2134, if a foreigner should travel through the Chickasaw Nation upon a palace car, without a passport from the Department of the Interior, he incurs the penalty of $1,000. Under section 2133, Revised Statutes, if any person other than an Indian shall attempt to reside in one of these incorporated cities as a trader, or to introduce goods, or to trade therein, he forfeits all merchandise offered for sale to the Indians, or found in his possession, and shall moreover incur a penalty of $500. Under section 2135 every person other than an Indian, who, within the Chickasaw Nation, purchases or receives of any Indian in the way of barter, trade, or pledge, a gun, trap, or other article commonly used in hunting, any instrument of husbandry, or cooking utensils of any kind, or any articles of clothing, except skins or furs, shall be liable to a penalty of $50. Yet now in the Indian Territory some of the leading merchants are Indians, possessed of wholesale and retail dry goods, hardware, and implement establishments. Under section 2138, Revised Statutes, every person who drives or removes, except by authority of an order lawfully issued by the Secretary of War connected with the movement or subsistence of troops, any cattle, horses, or other stock from the Chickasaw Nation for the purpose of trade or commerce, is punishable by imprisonment for not less than three

years, or by fine of not moʌe than five thousand dollars, or
both. Those who contend that these old Intercourse laws
are still in force, profess to see no change in the policy of the
Government since their enactment. They profess to see no
inconsistency between this old law intended to maintain the
Indians in a state of isolation, and to obviate strife with the
white man by prohibiting traffic, and the recent legislation
making him a citizen of the United States with all the rights
and duties which that term implies, and shaping the Indian
Territory for admission into the Union as a State at no dis-
tant day. The Secretary of the Interior says, in effect, that
the Chickasaw Nation is still a hunting ground; the Indian is
living in a state of isolation; he is not trading and trafficking
with his white brother; there are no towns and cities law-
fully established in the Chickasaw Nation, because there
were none on June 30, 1834, and since then nothing has been
done — all is blank. There are no railroads, telegraph com-
panies, water works, sewer systems and other enterprises in
that country indicative of modern civilization, because none
are mentioned or provided for in the act of June 30, 1834.
No one has a right to live in that country or in the cities there
incorporated by law, provided that the Commissioner of In-
dian Affairs and the Secretary of the Interior conclude from
any cause his presence is detrimental to the peace and wel-
fare of the Indians. It was so in 1858, when the white man
was a trespasser, and since then no changes have occurred,
and he is still a trespasser.

*Mr. Willis Van Deventer, Assistant Attorney-General,* and
*Mr. A. C. Campbell, Assistant Attorney,* for the appellees:

1. The allegations in the bill, which amount to statements
of the legal effect of the act of the Chickasaw National Coun-
cil, or of the regulations of the Secretary of the Interior in
question, or of the power and authority of the Indian Bureau
in the premises, are not admitted by the demurrer. Daniels,
Ch. Pl. and Pr., vol. 1, p. 552, 5th ed.; *Maese* v. *Hermann,*
17 App. D. C. 52, 59.

2. If the matters complained of are unauthorized, as contended by appellants, they have a complete and adequate remedy at law by an action for damages against those who may, by order of the Secretary of the Interior, remove appellants' live stock from the nation; hence a court of equity should not interfere. *Beck* v. *Flournoy L. S. & R. E. Co.,* 27 U. S. App. 618, 630–631; *S. C.,* 65 Fed. Rep. 37–38; affd., 163 U. S. 686; *Cruickshank* v. *Bidwell,* 176 U. S. 73–80.

3. The Chickasaw Nation has such an interest in the subject-matter of the controversy as makes it an indispensable party to the suit, and it having been omitted, the action cannot be sustained. The general rule in chancery is that all those whose presence is necessary to a determination of the entire controversy must be made parties. Section 737 of the Revised Statutes and the equity rules do not have the effect of permitting the court to proceed in the absence of an indispensable party. *Shields* v. *Barrow,* 17 How. 130, 141.

While the above decision was rendered prior to the passage of the act of Congress which is now incorporated into the Revised Statutes as section 737, yet the ruling so made was, in the language used, approved in *Greeley* v. *Lowe,* 150 U. S. 58, 70. See also *Chadbourne's Ex.* v. *Coe,* 10 U. S. App. 78, 83; *S. C.,* 51 Fed. Rep. 479. The complainants are seeking to enforce a claimed right to graze or range their cattle over lands which are the property of the tribe (*Stephens* v. *Cherokee Nation,* 174 U. S. 445, 488) without payment of the permit fees which are exacted by the tribe under its tribal laws, and which constitute a source of revenue to the tribe and are its property. That the Chickasaw Nation is an indispensable party is amply illustrated by authority. *Swan Land & Cattle Co.* v. *Frank,* 148 U. S. 603, 610; *New Orleans Water Works Co.* v. *New Orleans,* 164 U. S. 471, 480; *Minnesota* v. *Northern Securities Co.,* 184 U. S. 199, 235–238; *Litchfield* v. *Register and Receiver,* 9 Wall. 575, 578; *Sioux City Terminal R. & W. Co.* v. *Trust Co. of N. A.,* 49 U. S. App. 523, 530; *S. C.,* 82 Fed. Rep. 124, 126; *Northern Ind. Rd. Co.* v. *Michigan Cent. R. Co.,* 15 How. 233, 244, 245; *State of Kansas* v. *Anderson,* 5 Kans. 90, 114; *Mc-*

*Carthy* v. *Walsh,* 41 Kans. 17, 19; *Union Terminal Co.* v. *Board of Railroad Commissioners,* 52 Kans. 680; *S. C.,* 35 Pac. Rep. 224–225; *Beasley* v. *Shively,* 20 Ore. 508–510; *S. C.,* 26 Pac. Rep. 846; *Gregory* v. *Stetson,* 133 U. S. 579, 586; *Donovan* v. *Campion,* 85 Fed. Rep. 71–72; *S. C.,* 56 U. S. App. 388, 390; *California* v. *S. P. R. Co.,* 157 U. S. 229, 251; *Maese* v. *Hermann,* 17 App. Cas. 52, 60–66.

Mr. Justice SHEPARD delivered the opinion of the Court:

Before proceeding to the consideration of the substantial questions involved in the case, it becomes necessary to pass upon two grounds of the demurrer which, though overruled in the court below, have been urged on the argument as sufficient to sustain the decree dismissing the bill, regardless of all others.

The first of these is, that there is no jurisdiction for relief in equity because the remedy at law by action for damages is plain, adequate and complete.

The second is, that the Chickasaw Nation is an indispensable party to the suit.

We agree with the court below that these objections are insufficient.

(1) Assuming the entire want of legal authority for the threatened interference with the property of the complainants, that interference, under the facts alleged in the bill, would not only be an act of wrong and oppression, but might cause irreparable damage. *Watson* v. *Sutherland,* 5 Wall. 74; *Cherokee Nation* v. *Hitchcock,* 187 U. S. 294.

Moreover, the particular case presents an additional ground why a court of equity should take jurisdiction, in that by so doing it may prevent a multiplicity of suits.

It is true, the complainants have no community of interest in the subject-matter of controversy between each of them and the defendants, because each has a separate and distinct property right that is threatened with invasion; but they do have a common interest in the essential questions of law and fact involved in the general controversy. The question of

jurisdiction, however, does not depend upon this last ground alone, hence we need not engage in the controversy that has been waged concerning its sufficiency, wherein the affirmative has been maintained by Mr. Pomeroy (1 Eq. Jur., Secs. 268–269), and the negative, with at least equal force and learning, by Chief Justice Campbell, speaking for the Supreme Court of Mississippi. *Tribette* v. *Ill. C. R. Co.,* 70 Miss. 182.

As equity has undoubted jurisdiction to restrain injuries to property when properly invoked by a single individual, all the authorities agree that a number of persons similarly situated and having a common interest in the questions of law and fact that must be determined in each case, may join, or be joined in order to avoid the vexation, costs, and sometimes delay of justice, that would result from a multiplicity of suits.

(2) A government of the dependent nature and limited powers of the Chickasaw Nation cannot be an indispensable party to a proceeding to restrain officers of the United States, who, acting under the supposed obligation of the laws of the United States as guardians of the Indians, have undertaken to perform duties assigned them by the act of the tribal legislature.

A sovereign State, even, is not a necessary party to a suit to enjoin officers charged with the collection of taxes from seizing or selling property under a law the validity of which may be attacked.

The application of the rule in this case is not affected by the second section of the act of Congress approved June 28, 1898, which reads as follows: " That when in the progress of any civil suit, either in law or equity, pending in the United States court in any district in said Territory, it shall appear to the court that the property of any tribe is in any way affected by the issues being heard, said court is hereby authorized and required to make said tribe a party to said suit by service upon the chief or governor of the tribe, and the suit shall thereafter be conducted and determined as if said tribe had been an original party to said action."

Passing by the question whether this section applies to

proceedings in any other than the District courts within the territory, it governs in those cases only where the title to property claimed by the tribe is involved. This tax, license, charge, or whatever it may be properly called, is not the property of the tribe in the sense of the statute.

The first main contention on behalf of the appellants is, that the Chickasaw Nation had no power to enact the legislation complained of, because it has never had any legislative or governmental power or authority over white persons, not members of the nation, or over their property for the purpose of taxation.

It is undoubtedly true that the Chickasaw Nation is not a sovereign in the international sense, or in the sense that a state of the Union is sovereign; but a dependent political community under the dominion and guardianship of the United States. *Cherokee Nation* v. *RR. Co.,* 135 U. S. 641; *Cherokee Nation* v. *Hitchcock,* 187 U. S. 294. Hence, the powers of its council and legislature must be exercised subject to supervision by the United States, and under the limitations of treaties made with, and laws enacted by them.

In determining the question propounded, it is only necessary to recite certain articles of the treaties made with the Chickasaw Indians, that have been relied upon as pertinent thereto.

Article 7 of the Treaty of June 22, 1855, reads:

" So far as may be compatible with the Constitution of the United States and the laws made in pursuance thereof, regulating trade and intercourse with the Indian tribes, the Choctaws and Chickasaws shall be secured in the unrestricted right of self-government, and full jurisdiction over person and property within their respective limits; excepting, however, all persons, with their property, who are not by birth, adoption, or otherwise, citizens or members of either the Choctaw or Chickasaw tribe, and all persons not being citizens or members of either tribe, found within their limits shall be considered intruders and be removed from and kept out of the same by the United States Agent, assisted if necessary by the military, with the following exceptions, viz.: such indi-

viduals as are or may be in the employment of the government, and their families; those peacefully travelling or temporarily sojourning in the country or trading therein, under licenses from the proper authority of the United States, and such as may be permitted by the Choctaws or Chickasws, with the assent of the United States Agent, to reside within their limits without becoming citizens or members of either of said tribes." (11 Stat. 611.)

By Article 14, the United States obligated themselves to protect the said Indians from domestic strife, hostile invasion and " from aggression by other Indians and white persons, not subject to their.jurisdiction and laws."

By the treaty of April 28, 1866, the two triLes mentioned agreed to such legislation as Congress may deem necessary for the better administration of justice and the protection of rights of persons and property in the Indian Territory: " *Provided,* however, such legislation shall not in any wise interfere with or annul their present tribal organization, or their respective legislatures, or judiciaries, or the rights, laws, privileges or customs of the Choctaw and Chickasaw Nations, respectively." (14 Stat. 769.)

Article 8 of the same treaty conferred power of legislation upon all subjects pertaining to the intercourse of the Indians with each other, " the administration of justice between members of the several tribes of the said Territory and persons other than Indians and members of said tribes or nations, the construction of works of internal improvement and the common defence and safety of the nations of said Territory." All laws are made subject to suspension by the Secretary of the Interior or the President of the United States, and none shall be enacted inconsistent with the Constitution or laws of the United States, or existing treaty stipulations with the United States.

Under these and former treaties, the Chickasaw Indian Nation was inducted into, and has been confirmed in, the possession of a large body of public land over which, held and occupied in common, it has been permitted to exercise the powers recognized and confirmed by those treaties.

Under the duties assumed in the said treaties, and the general obligation of their relations as guardians of the Indians, the United States have from time to time enacted laws regulating intercourse with them and looking to the protection of their guaranteed rights and privileges. The older laws of the kind are found in Title XXVIII, R. S.

Among the pertinent sections embodied in that title, one prescribes a penalty for driving stock upon the lands of an Indian tribe, to graze thereon without the consent of such tribe. (Sec. 2117.) Another prescribes a penalty for settlement on Indian lands and the removal of settlers by the use of the military force of the United States when necessary. (Sec. 2118.) By another, the Superintendent of Indian Affairs, and the agents are authorized to remove intruders by force. (Sec. 2147.)

A later enactment (June 12, 1858), provides that: " The Commissioner of Indian Affairs is authorized and required with the approval of the Secretary of the Interior, to remove from any tribal reservation any person being therein without authority of law, or whose presnce within the limits of the reservation may, in the judgment of the Commissioner, be detrimental to the peace and welfare of the Indians; and may employ for the purpose such force as may be necessary to enable the agent to effect the removal of such persons." R. S., Sec. 2149.

The right of the Indian tribes to regulate their own domestic concerns was uniformly recognized by the United States in all their treaties, dealings with, and legislation respecting the Indians; and persons, not within the exceptions of Article 7 of the Treaty of 1855, or under the permission of the tribes as provided therein, have often been removed from the tribal limits, as intruders whose presence was detrimental to the peace and welfare of the Indians, by the executive officers of the United States, without question in so far as we have been advised.

By the terms of the act, the enforcement of which is sought to be enjoined, if the privilege or permit tax be not paid upon demand, " the presence of such live stock, and owners or hold-

ers thereof, within the limits of said Nation, shall be deemed detrimental to the peace and welfare of the Chickasaw Indians." If this is to be regarded as a condition of permission to enter and remain within the limits of the nation, it seems clearly within the power vested in its legislature; and persons failing to comply with the conditions become intruders, and subject to removal by the authorities of the United States. *Maxey* v. *Wright* (Court of Appeals I. T.), 54 S. W. Rep. 807. That case, which arose after the passage of the " Curtis " bill, involved the right of the Creek Nation — under authority similar to that claimed by the Chickasaw Nation in this case — to impose an occupation tax upon lawyers, not members of the nation. The right was upheld, and the court refused the injunction prayed for to restrain the removal of the plaintiff who had refused to pay the tax. That judgment was affirmed by the Circuit Court of Appeals for the Eighth Circuit, without a written opinion. See also 17 Op. Atty.-Gen. 134; 18 Idem, 35; 23 Idem, 214.

We are unable to agree with the contention of the appellants, that the sections of the Revised Statutes above referred to " are not in force in the Chickasaw Nation because inapplicable to conditions existing there, and inconsistent with subsequent legislation." It may be conceded that many of the provisions of the " Trade and Intercourse " laws contained in Title XXVIII, R. S., are inconsistent with subsequent legislation enacted to meet changed conditions in the Indian Territory, and are therefore to be regarded as repealed by implication.

But whilst former statutes may be repealed, or annulled by implication through the enactment of subsequent legislation, the doctrine is not a favored one, and, therefore, to work such repeal or annulment, the repugnancy between the one and the other, in relation to a particular subject-matter, must be so clear as to admit of no other reasonable construction. *Cope* v. *Cope,* 137 U. S. 682, 686. We have been cited to no special provisions of subsequent legislation that necessarily indicate the repeal or annulment of those sections, before referred to,

which, in addition to the general powers of supervision of the affairs of the Indians, as long as their tribal relations shall exist, make provision for the protection of the Indians from the intrusion of strangers without their consent, in execution of treaties that have been recognized by the latest legislation affecting the nations of the Indian Territory. (30 Stat. 495; 32 Stat. 641.) The particular provisions of those acts and the changes wrought thereby will be discussed later when we come to consider the effect of the leases made to the appellants by individual members of the tribe, upon their right to graze cattle within the tribal limits.

Assuming the right of the defendants to remove the owners of the cattle as intruders upon Indian lands, it is further contended that there is no corresponding right to remove the cattle, because property of the kind is not mentioned in the aforesaid removal laws, the nature of which requires their strict construction. We cannot yield assent to this view. The right to remove the owner of the property because his presence has become detrimental to the peace and welfare of the Indians, in our opinion, includes the right to remove his property also. *Echols* v. *Tate,* 53 Ark. 12.

The State of Arkansas is contiguous to the Indian Territory, and her laws have been adopted for the government of the latter. Like the decisions of the Court of Appeals of the Indian Territory, that of the Supreme Court of Arkansas, giving interpretation to the laws relating to the guardianship and protection of the Indians, is entitled to more than ordinary weight.

The entry and persistent residence of unlicensed persons within the limits of the Chickasaw Nation, for the purpose of grazing cattle upon lands therein, may create a continuing nuisance of serious character and consequences. When, in the judgment of the Commissioner of Indian Affairs, (R. S. 2149) this presence is detrimental to the peace and welfare of the Indians, it becomes his plain duty to remove the persons by force if necessary. If this cannot be done by removing the owners, then we see no reason why he should not abate the nuisance by the removal of the cattle; for it is the grazing of

herds of cattle that constitute the *gravamen* of the nuisance, whether they be controlled by the owners in person, or through agents who may be members of the nation, or otherwise entitled to reside within its boundaries.

It is by the removal of the cattle that the peace and welfare of the Indians are to be secured.

The exercise of the discretion of the executive officers of the United States in such cases is not subject to review in this proceeding; but, if it were, we could scarcely find a better foundation for it in the present case, than in the formal declaration of the Indian legislature.

We are inclined to the view that the charge imposed by the Indian legislature is to be regarded as a condition of the admission of cattle to graze upon Indian lands, by way of a license fee or tax, and not as of the nature of a regular tax upon property of the kind. This intention is indicated in the act, which does not provide for the seizure and sale of the cattle for the tax, but merely for their removal, that is to say, the withdrawal of permission, as the sole condition of nonpayment.

But in either view, we regard the act as within the legislative power of the Chickasaw Nation.

The Indian treaties, as we have seen, recognized and guaranteed the existence of a tribal government by the Chickasaw Nation within the limits assigned thereto.

A government of the kind necessarily has the power to maintain its existence and effectiveness through the exercise of the usual power of taxation upon all property within its limits, save as may be restricted by its organic law. Any restriction in the organic law in respect of this ordinary power of taxation, and the property subject thereto, ought to appear by express provision or necessary implication. *Board Trustees* v. *Indiana,* 14 How. 268, 272; *Talbott* v. *Silver Bow Co.,* 139 U. S. 438, 448. Where the restriction upon this exercise of power by a recognized government, is claimed under the stipulations of a treaty with another, whether the former be dependent upon the latter or not, it would seem that its existence ought to appear beyond a rea-

sonable doubt.  We discover no such restriction in the clause of Article 7 of the Treaty of 1855, which excepts white persons from the recognition therein of the unrestricted right of self-government by the Chickasaw Nation, and its full jurisdiction over persons and property within its limits. The conditions of that exception may be fully met without going to the extreme of saying that it was also intended to prevent the exercise of the power to consent to the entry of noncitizens, or the taxation of property actually within the limits of that government and enjoying its benefits.  The power of the Creek Nation — under treaties identical with those made with the Chickasaw Nation — to impose an occupation tax upon a citizen of the United States, licensed to trade therein, has been upheld by the Circuit Court of Appeals for the Eighth Circuit.  *Crabtree* v. *Madden,* 54 Fed. Rep. 426, 429.  In that case it was said by Sanborn, C. J.: " These treaties and this legislation demonstrate that this tribe has carefully preserved its separate political identity, and that it is still managing its own affairs, and exercising, through officers of its own selection, legislative, executive and judicial functions within its territorial jurisdiction. The tax which it is sought to collect by this action was imposed by the laws of the tribe.  If the tribe had lawful authority to impose it, it had equal power to prescribe the remedies and designate the officers to collect it."  The same doctrine as regards the right of the Cherokee Nation to impose a tax upon hay exported therefrom, though cut under valid contracts with the lawful occupiers of Indian lands, has been maintained by the Attorney-General in a recent opinion given upon the request of the Secretary of the Interior.  23 Op. Atty.-Gen. 528.

The right to impose this hay tax came before the Court of Appeals of the Indian Territory in a recent case, but was not determined, because the Indian legislative act was not proved, and the court declined to take judicial notice of it.  *Kelly* v. *Churchill,* 69 S. W. Rep. 817.

Some of the expressions, however, of the same court in another case (*Buster* v. *Wright,* 69 S. W. Rep. 882), would

seem to be opposed to the view that property, as well as the owner thereof refusing to pay a tax, may be removed from the territory. The case arose in the town of Wagoner on a bill brought by citizens of the United States to enjoin their removal, and the closing of their place of business for refusal to pay the Indian tax. The court reaffirmed the doctrine enounced in *Maxey* v. *Wright,* as to the right of removal of the person, but denied the right to close the place of business of the complainants, saying: "The one is the enforcement of a penalty for being an intruder; the other, if allowed, would be the means of collecting a debt." Without going into the consideration of the effect of various acts of Congress relating to town sites and municipal corporations organized therein, it is sufficient to say that the decision was not necessary to the disposition of the case, because, after the decree below, Congress passed the act of May 27, 1902, making it unlawful to remove any person in lawful possession of a lot or parcel of land in any designated town site. Moreover, the view that the tax was of the nature of a debt to be collected by judicial process — unless there has been some additional legislation by Congress not referred to in the opinion — is opposed to the decision of the Circuit Court of Appeals before referred to. *Crabtree* v. *Madden,* 54 Fed. Rep. 426, 431.

A further contention on behalf of the appellants is, that assuming the right to regulate the occupation of Indian lands and to remove intruders and their cattle therefrom under the former treaties, and acts of Congress in aid of their guaranties, an exceptional condition has been created by certain special provisions of the agreement embodied in the "Curtis" bill, to the benefits of which they are entitled by virtue of contracts made with individual members of the Chickasaw Nation.

The bill, it will be remembered, alleges that the cattle of complainants are grazing upon land in the Chickasaw Nation that has been held, used, and claimed by individual Indians of said nation as their approximate shares upon allotment, under contracts with, and upon terms satisfactory to said

individual Indians. The additional allegation, that there is not now, and for four years has not been any public domain of said nation; but that practically all the land in the nation is now enclosed, claimed and occupied by individual members of the nation as their approximate shares upon allotment, by reason of which the nation has no longer jurisdiction over the same, states a conclusion of law that is not admitted by the demurrer.

The " Curtis " bill, approved June 28, 1898, has undoubtedly worked a great change in the public policy heretofore controlling relations with the Chickasaw and other nations of the Indian Territory. It provides for an allotment of the lands among the individual members of the nation upon certain terms and conditions. It abolishes the tribal courts, but maintains the tribal organization for eight years from March 4, 1898, with legislative power, which when exercised in certain particulars must be approved by the President of the United States. These eight years of tribal organization were provided to give ample time for the settlement of all disputes as to membership, for the allotment of the lands, and for preparation for statehood; and upon their expiration the Chickasaws will become possessed of all the rights and privileges of citizens of the United States. Section 11 of this act provides that the lands susceptible of allotment, with some reservations, shall be allotted to citizens of the nation, giving each his fair and equal share thereof. Section 16 reserves to the tribe the rents and royalties for the use of minerals and timber, and provides that where any citizen shall be in possession of such lands as would be his reasonable share, he may continue to use the same and receive the rents thereof until allotment shall be made to him. Section 23 annuls all leases of agricultural and grazing land by January 1, 1900; " but this shall not prevent individuals from leasing their allotments when made to them as provided in this act, nor from occupying or renting their proportionate shares of the tribal land until the allotments herein provided for are made."

Allotments are to be made under the general supervision

of the Secretary of the Interior, and he is empowered to appoint an Indian inspector to perform the duties required of the Secretary. (That officer is one of the defendants in this case.)

Without giving further details of the act, it is sufficient to say in the language of *Maxey* v. *Wright, supra:* "The 'Curtis Bill,' from beginning to end recognizes this continued authority of the Secretary of the Interior Department, and in many instances enlarges it." And it was further said in the same case: "Whatever effect the 'Curtis Bill' may have upon the Creeks (Chickasaws) it has not yet been carried into operation so far as it changes their title to their lands, or their tribal relations with the United States."

The "Curtis Bill" has been amended by the act approved July 1, 1902 (32 Stat. 641). These amendments do not affect the sections of the former law above referred to, but make some changes in respect of allotments. It requires that three hundred and twenty acres shall be allotted to each member of the tribe, of which one hundred and sixty acres shall constitute a homestead, and be inalienable for twenty-one years from the date of the certificate of allotment. The remaining land shall be alienable after issue of patent as follows: one-fourth in one year, one-fourth in three years, and the remainder in five years; provided, however, that it shall not be alienable at any time before the expiration of the tribal governments for less than its appraised value. These provisions fully confirm the extract above made from the opinion in *Maxey* v. *Wright*.

Neither of the aforesaid acts of Congress undertakes to repeal or annul the provisions of the Revised Statutes that have been before mentioned, looking to the protection of the Indians from intruders upon their lands. We are, therefore, of the opinion that as long as the tribal government shall exist with the modified powers of government recognized in the "Curtis Bill," those laws will remain in full force. Consequently, the power conferred upon individual Indians of leasing their several proportions of the tribal lands, must be exercised in subordination to those laws, and subject to

the jurisdiction of the nation within the governmental powers still remaining therein. Included in these, as we have seen, and subject to the approving power of the President of the United States, are the power to impose conditions upon the entry of unauthorized persons, and the power to impose taxes by way of condition, or license, or upon property generally. At least until the allotments shall have been made, if not until the tribal government shall end by the terms of the act of 1898, the title to the lands, to the extent recognized by the United States, remains in the nation. *Cherokee Nation* v. *Hitchcock,* 187 U. S. 294.

Whether the duty of enforcing its regulations, or collecting its taxes can be imposed upon the Secretary of the Interior and his subordinates, by the legislature of the Chickasaw Nation, is a question that is not involved in the case.

By the terms of the " Curtis Bill," the laws of the nation were denied enforcement in the courts of the United States for the Indian Territory. (Sec. 26.)

Section 28 abolishes all of the tribal courts. Another section authorizes the Secretary of the Interior to appoint an Indian inspector in the territory who may, under his authority and direction, perform any duties required of the Secretary relating to affairs therein. (Sec. 27.)

The administrative control of the affairs of the Indians by the United States, through their executive officers, not only remains unimpaired, but has been increased.

The abolition of the tribal courts and the taking away from the territorial courts of the United States of all jurisdiction to enforce tribal laws, would, under the expressly continued legislative power of the nation, render those laws wholly inoperative without the assistance of the executive officers of the United States. It is unnecessary to refer to the various sections of the Revised Statutes investing these officers with power to superintend and control the affairs of the Indians.

Under those laws and the provisions of the " Curtis Bill," we are of the opinion that the Secretary of the Interior had the right, if it were not his duty, to enforce an enactment

within the powers of the legislature of the Chickasaw Nation that had received the requisite formal approval of the President of the United States.

We regard it as unnecessary to consider the several articles of the regulations prescribed by the Secretary of the Interior for the complete enforcement of the act in question, in order to determine whether they add to its provisions, or exceed its objects, or are beyond the general powers invested in him for the control of Indian affairs. Those articles looking to the ascertainment of the permit tax, the dates of commencement, the giving of notice, and the like, are not involved in the case. The appellants admit the occupation of the lands, and the refusal to pay the tax under any conditions. The single question then is, whether, failing to pay the tax, they and their cattle may be removed from the territory of the Chickasaw Nation by the Secretary of the Interior and the officers acting under his direction; and that has been determined.

Other propositions that have been argued need not be discussed, as they are included in the conclusions before enounced.

The decree dismissing the bill was right, and will be affirmed, with costs. It is so ordered.        *Affirmed.*

A writ of error to the Supreme Court of the United States was prayed by the appellants and allowed, April 21, 1903.