## CHEROKEE NATION *v.* HITCHCOCK.

APPEAL FROM THE COURT OF APPEALS OF THE DISTRICT OF COLUMBIA.

No. 340. Submitted October 23, 1902.—Decided December 1, 1902.

In an action brought by the Cherokee Nation to enjoin the Secretary of the Interior from leasing oil lands held for the benefit of said Nation under section 13 of the act of Congress approved June 20, 1898, it is not necessary to join as parties defendants the persons or corporations to whom the Secretary proposes to make the leases.

The act of Congress entitled "An act for the protection of the people of the Indian Territory, and for other purposes," approved June 28, 1898, which by section 13 thereof gives the Secretary of the Interior exclusive power over oil, coal, asphalt and other minerals in said Territory, and authorizes him to make leases of oil, coal, asphalt and other minerals

under certain prescribed conditions, the royalties and rents to be paid into the Treasury of the United States to the credit of the tribe to which they belong, is, notwithstanding the provisions of the treaties with the Cherokee Nation, a valid exercise of power vested in Congress and fully authorizes the Secretary of the Interior to make such leases in the manner prescribed in the act.

This court has already (*Stephens* v. *Cherokee Nation*, 174 U. S. 445) sustained the validity of the act of Congress of June 28, 1898, and the precedent of co-relative legislation, wherein the United States practically assumed the full control over the Cherokees, as well as the other nations constituting the five civilized tribes, and took upon itself the determination of membership in the tribes for the purpose of adjusting their rights in the tribal properties. That decision necessarily involves the further holding that Congress is vested with authority to adopt measures to make the tribal property productive and secure therefrom an income for the benefit of the tribe.

Under the treaties with, and patents issued to, the Cherokee Nation, whatever of title has been conveyed has been to the Cherokees as a Nation. And no title to any land is in any of the individuals although held by the tribe for the common use and equal benefit of all the members.

This court is not concerned with the question whether the act of June 28, 1898, is wise or will operate beneficially to the interest of the Cherokees, as the power which exists in Congress to administer upon, and guard, the tribal property is political and administrative in its nature, and the manner of its exercise is a question within the province of the legislative branch to determine and is not one for the courts.

THIS cause was begun on the equity side of the Supreme Court of the District of Columbia. The complainants named in the bill were the Cherokee Nation, and its principal chief and treasurer and sundry other citizens of the nation, suing on behalf of themselves and of citizens of the nation residing in the Indian Territory. Ethan A. Hitchcock, as Secretary of the Interior, was made sole defendant. It was claimed in the bill that, by virtue of certain treaties and a patent based thereon, the Cherokee Nation was vested with a fee simple title to its tribal lands in the Indian Territory, and it was also averred that, by a treaty executed in 1835, there was secured to the nation the right, by its national council, to make and carry into effect all such laws as the Cherokees might deem necessary for the government and protection of the persons and property within their own country belonging to their people, or such persons as had connected themselves with them. A synopsis

of the pertinent portions of the treaties above referred to is set
out in the margin.[1]

---

[1] By article 2 of the treaty of May 6, 1828, 7 Stat. 311, the United States,
in order to secure to the Cherokee Nation "a permanent home," agreed to
"possess the Cherokées, and to guarantee it to them forever," seven mil-
lion acres of land, within described boundaries, and in addition "guar-
anteed to the Cherokee Nation a perpetual outlet, west, and a free and un-
molested use of all the country lying west of the western boundary of the
above-described limits, and as far west as the sovereignty of the United
States, and their right of soil extend."

By article 1 of the treaty of February 14, 1833, 7 Stat. 414, the United
States, by a corrected description as to the seven million acres tract, re-
newed the guaranty as to such tract, the outlet, etc., contained in article 2
of the treaty of 1828, with the reservation respecting use by other Indians
of the salt plain if within the limits of the outlet. The article concluded
with the statement that "letters patent should be issued by the United
States as soon as practicable for the land hereby guaranteed."

By article 2 of the treaty of December 29, 1835, 7 Stat. 478, after reciting
that by the treaties of 1828 and 1833, "the United States guaranteed and
secured to be conveyed by patent, to the Cherokee Nation of Indians," a
described tract of seven million acres of land, and had further guaranteed
to the Cherokee Nation a perpetual outlet west, etc., ceded an additional
eight hundred thousand acres of land, in the following terms:

"And whereas it is apprehended by the Cherokees that in the above ces-
sion there is not contained a sufficient quantity of land for the accommo-
dation of the whole nation on their removal west of the Mississippi, the
United States in consideration of the sum of five hundred thousand dollars
therefore hereby covenant and agree to convey to the said Indians, and
their descendants by patent, in fee simple the following additional tract of
land."

By article 3 of the same treaty the United States also agreed—
"that the lands above ceded by the treaty of February 14, 1833, including
the outlet, and those ceded by this treaty, shall all be included in one pat-
ent executed to the Cherokee Nation of Indians by the President of the
United States according to the provisions of the act of May 28, 1830."

The act of May 28, 1830, 4 Stat. 411, conferred authority upon the Presi-
dent to create districts of territory in land west of the Mississippi to be
exchanged for lands held by Indians in a State or Territory. Respecting
the title to the lands so to be given in exchange, it was provided in sec-
tion 3 as follows:

"SEC. 3. *And be it further enacted,* That in the making of any such ex-
change or exchanges, it shall and may be lawful for the President solemnly
to assure the tribe or nation with which the exchange is made, that the
United States will forever secure and guaranty to them, and their heirs or
successors, the country so exchanged with them; and if they prefer it, that

The patent referred to in the bill was executed on December 31, 1838. It conveyed to the Cherokee Nation the lands secured and guaranteed by the treaties of 1828, 1833 and 1835.

---

the United States will cause a patent or grant to be made and executed to them for the same: *Provided always*, That such lands shall revert to the United States, if the Indians become extinct, or abandon the same."

The article of the treaty of 1835 upon which is based the claim that an exclusive right is vested in the Cherokee Nation to the use, control and occupancy of its tribal lands is the following, 7 Stat. 481:

"ARTICLE 5. The United States hereby covenant and agree that the lands ceded to the Cherokee Nation in the foregoing article shall, in no future time without their consent, be included within the territorial limits or jurisdiction of any State or Territory. But they shall secure to the Cherokee Nation the right by their national councils to make and carry into effect all such laws as they may deem necessary for the government and protection of the persons and property within their own country belonging to their people or such persons as have connected themselves with them: *Provided always*, That they shall not be inconsistent with the Constitution of the United States and such acts of Congress as have been or may be passed regulating trade and intercourse with the Indians; and also, that they shall not be considered as extending to such citizens and army of the United States as may travel or reside in the Indian country by permission according to the laws and regulations established by the government of the same."

"By the treaty of August 6, 1846, 9 Stat. 871, providing for an adjustment of the differences theretofore existing between different portions of the people constituting and recognized as the Cherokee Nation of Indians, it was provided in article 1 as follows:

"That the lands now occupied by the Cherokee Nation shall be secured to the whole Cherokee people for their common use and benefit; and a patent shall be issued for the same, including the eight hundred thousand acres purchased, together with the outlet west, promised by the United States, in conformity with the provisions relating thereto, contained in the third article of the treaty of 1835, and in the third section of the act of Congress, approved May twenty-eighth, 1830, which authorizes the President of the United States, in making exchanges of lands with the Indian tribes, 'to assure the tribe or nation with which the exchange is made, that the United States will forever secure and guarantee to them, and their heirs or successors, the country so exchanged with them; and, if they prefer it, that the United States will cause a patent or grant to be made and executed to them for the same: *Provided always*, That such lands shall revert to the United States, if the Indians become extinct or abandon the same.' "

The treaty of July 19, 1866, 14 Stat. 799, does not require particular notice.

In the patent the seven million acre tract, together with the perpetual outlet, was described as one tract, aggregating 13,574,135.14 acres. In addition the patent specified the boundaries of a tract of 800,000 acres ceded by the treaty of 1835. The description of the two tracts was succeeded by the following habendum clause:

"Therefore, in execution of the agreements and stipulations contained in the said several treaties, the United States have given and granted, and by these presents do give and grant unto the said Cherokee Nation the two tracts of land so surveyed and hereinbefore described, containing in the whole fourteen millions, three hundred and seventy-four thousand, one hundred and thirty-five acres, and fourteen-hundredths of an acre, to have and to hold the same, together with all the rights, privileges and appurtenances thereto belonging to the said Cherokee Nation forever; subject, however, to the right of the United States to permit other tribes of red men to get salt on the salt plain on the western prairie referred to in the second article of the treaty of the twenty-ninth of December, one thousand eight hundred and thirty-five, which salt plain has been ascertained to be within the limits prescribed for the outlet agreed to be granted by said article, and subject also to all the other rights reserved to the United States, in and by the articles hereinbefore recited, to the extent and in the manner in which the said rights are so reserved; and subject also to the condition provided by the act of Congress of the twenty-eighth of May, one thousand eight hundred and thirty, referred to in the above-recited third article, and which condition is, that the lands hereby granted shall revert to the United States if the said Cherokee Nation becomes extinct or abandons the same."

Averring that the Cherokee Nation and its citizens possessed the exclusive right to the use, control and occupancy of its tribal lands, it was alleged that the Secretary of the Interior, without having lawful authority so to do, was assuming the power to and was about to pass favorably upon applications for leases, and was about to grant leases of lands belonging to said nation for the purpose of mining for oil, gas, coal and other minerals, one such successful applicant being stated to

be The Cherokee Oil & Gas Company, an Arkansas corporation. Based upon general allegations of the absence of an adequate remedy at law, the necessity of relief to avoid a multiplicity of suits and to prevent the casting of a cloud upon the title of the nation to its said lands, and the claim that irreparable injury would be caused and wrong and oppression result, and that there would be a deprivation of property rights of the complainants and of other citizens of the Cherokee Nation, an injunction was prayed against further action by the Secretary of the Interior in the premises. A demurrer was filed to the bill upon the grounds following:

"1. Said bill is bad in substance and for want of equity, and does not state facts sufficient to entitle complainants to the relief prayed for or to any relief.

"2. The court has no jurisdiction over the subject-matter of the suit.

"3. There is a defect of parties defendant."

Without considering or passing upon the objection of a defect of parties defendant, the trial court sustained the demurrer and entered a decree dismissing the bill of complainant. This decree was affirmed, on appeal, by the Court of Appeals of the District.

An appeal was thereupon taken to this court.

*Mr. William M. Springer* for appellants.

*Mr. Assistant Attorney General Van Devanter* for appellee. *Mr. Assistant Attorney William C. Pollock* was with him on the brief.

Mr. Justice White, after making the foregoing statement, delivered the opinion of the court.

The grounds of demurrer to the bill of complaint were summarized in the following reasons embodied in a statement filed with the demurrer:

"1. The matters named in the bill are matters of administration, which cannot be taken away from an executive department and carried into the courts.

" 2. That the Cherokee Oil & Gas Company named in the bill is a necessary party to the suit, as shown by the bill.

" 3. That the defendant is proceeding in conformity with the act of Congress approved June 28, 1898, 30 Stat. 495, which is a valid exercise of the power of Congress over the property of an Indian tribe."

Preliminary to considering the fundamental question raised by the demurrer, it is necessary to notice two subjects not expressly referred to in the opinion below. They are, first, the objection to the formal sufficiency of certain of the averments in the bill; and, second, the claim that the Cherokee Oil & Gas Company was an indispensable party defendant. With respect to the first mentioned ground of objection, without going into detail, we think the statements in the bill were sufficient to show that the jurisdiction of a court of equity was properly invoked. So far as the second ground of objection is concerned, we presume that the courts below omitted to pass expressly thereon, because it was deemed that the company named was properly omitted from the bill. As the bill assailed generally the want of power in the Secretary of the Interior to execute leases affecting lands owned by the tribe, and referred to the application pending for a lease made by the Cherokee Oil & Gas Company, as manifesting but a particular instance in which it was charged that the Secretary of the Interior might exercise the power conferred by the statute, the corporation named was not an indispensable party to the bill. Clearly, all the persons with whom the Secretary might contract, if he exercised the discretion vested in him by the statute were not indispensable parties to the determination of the question whether the statute had lawfully conferred such discretionary power upon the official in question. This brings us to consider the fundamental question which the case involves, that is, the contention on behalf of the government that the decree below should be sustained because the act of June 28, 1898, is a valid exercise of power vested in Congress, and fully authorized the Secretary of the Interior to do and perform the things which the complainants seek to have him enjoined from doing.

Before noticing the pertinent provisions of the act of June 28,

1898, reference will be made to antecedent legislation by Congress which led up to the enactment of the statute in question. In the statement preceding the opinion, delivered through Mr. Chief Justice Fuller, in *Stephens* v. *Cherokee Nation,* 174 U. S. 445, it was said :

"By the sixteenth section of the Indian Appropriation Act of March 3, 1893, c. 209, 27 Stat. 612, 645, the President was authorized to appoint, by and with the advice and consent of the Senate, three commissioners 'to enter into negotiations with the Cherokee Nation, Choctaw Nation, Chickasaw Nation, the Muscogee (or Creek) Nation, the Seminole Nation, for the purpose of the extinguishment of the national or tribal title to any lands within that territory now held by any and all of such nations or tribes, either by cession of the same or some part thereof to the United States, or by the allotment and division of the same in severalty among the Indians of such nations or tribes, respectively, as may be entitled to the same, or by such other method as may be agreed upon between the several nations and tribes aforesaid, or each of them, with the United States, with a view to such an adjustment, upon the basis of justice and equity, as may, with the consent of such nations or tribes of Indians, so far as may be necessary, be requisite and suitable to enable the ultimate creation of a State or States of the Union which shall embrace the lands within said Indian Territory.'

"The Commission was appointed and entered on the discharge of its duties, and under the sundry civil appropriation act of March 2, 1895, c. 189, 28 Stat. 939, two additional members were appointed. It is commonly styled the 'Dawes Commission.'"

On November 20, 1894, and November 18, 1895, the Dawes Commission made reports of the condition of affairs in the Indian Territory. These reports, as also a report of the Senate Committee on the Five Civilized Tribes, of date May 7, 1894, were referred to and were quoted from in the statement of facts made by the court in the *Stephens* case. The reports asserted the existence of a state of affairs in the Indian Territory "abhorrent to the spirit of our institutions," and declared the ne-

cessity of assumption by the United States of "responsibility for future conditions in the Territory" and the need of independent legislation by Congress in that behalf. Thus, the Senate Committee on the Five Civilized Tribes of Indians, in a report on May 7, 1894, Sen. Rep. No. 377, 53d Cong. 2d sess., said in part :

"As we have said, the title to these lands is held by the tribe in trust for the people. We have shown that this trust is not being properly executed, nor will it be if left to the Indians, and the question arises, What is the duty of the government of the United States with reference to this trust ? While we have recognized these tribes as dependent nations, the government has likewise recognized its guardianship over the Indians and its obligations to protect them in their property and personal rights.

"In the treaty with the Cherokees, made in 1846, we stipulated that they should pass laws for equal protection and for the security of life, liberty and property. If the tribe fails to administer its trust properly by securing to all the people of the tribe equitable participation in the common property of the tribe, there appears to be no redress for the Indian so deprived of his rights unless the government does interfere to administer such trust."

By a provision in the act of June 10, 1896, 29 Stat. 321, 339, said commission was directed to continue the exercise of the authority already conferred upon it, and was invested with further powers in respect of hearing and determining applications for citizenship in said tribes and making rolls of the members thereof.

A provision in the act of June 7, 1897, 30 Stat. 62, 84, directed said commission to continue to exercise all authority theretofore conferred upon it to negotiate with said Five Tribes, and gave further direction respecting the making of rolls and citizenship.

The act of June 28, 1898, 30 Stat. 495, entitled "An act for the protection of the people of the Indian Territory, and for other purposes," contains provisions for the completion of the rolls of citizenship of said tribes, for the reservation of townsites

and the sale of lots therein, and for the allotment of the exclusive use and occupancy of the surface of all lands susceptible of allotment among the citizens of the respective tribes, with a provision as follows (sec. 11):

"But all oil, coal, asphalt, and mineral deposits in the lands of any tribe are reserved to such tribe, and no allotment of such land shall carry the title to such oil, coal, asphalt, or mineral deposits."

Section 13 of said act contains provisions for leasing the oil, coal, asphalt, and mineral deposits as follows:

"That the Secretary of the Interior is hereby authorized and directed from time to time to provide rules and regulations in regard to the leasing of oil, coal, asphalt, and other minerals in said Territory, and all such leases shall be made by the Secretary of the Interior; and any lease for any such minerals otherwise made shall be absolutely void. No lease shall be made or renewed for a longer period than fifteen years, nor cover the mineral in more than six hundred and forty acres of land, which shall conform as nearly as possible to the surveys. Lessees shall pay on each oil, coal, asphalt, or other mineral claim at the rate of one hundred dollars per annum, in advance, for the first and second years; two hundred dollars per annum, in advance, for the third and fourth years, and five hundred dollars, in advance, for each succeeding year thereafter, as advanced royalty on the mine or claim on which they are made. All such payments shall be a credit on royalty when each said mine is developed and operated and its production is in excess of such guaranteed annual advanced payments; and all lessees must pay said annual advanced payments on each claim, whether developed or undeveloped; and should any lessee neglect or refuse to pay such advanced annual royalty for the period of sixty days after the same becomes due and payable on any lease, the lease on which default is made shall become null and void, and the royalties paid in advance shall then become and be the money and property of the tribe. Where any oil, coal, asphalt, or other mineral is hereafter opened on land allotted, sold, or reserved, the value of the use of the necessary surface for prospecting or mining, and the damage done to the

other land and improvements, shall be ascertained under the direction of the Secretary of the Interior and paid to the allottee or owner of the land, by the lessee or party operating the same, before operations begin : *Provided*, That nothing herein contained shall impair the rights of any holder or owner of a leasehold interest in any oil, coal rights, asphalt, or mineral, which have been assented to by act of Congress, but all such interest shall continue unimpaired hereby, and shall be assured to such holders or owners by leases from the Secretary of the Interior for the term not exceeding fifteen years, but subject to payment of advance royalties as herein provided, when such leases are not operated, to the rate of royalty on coal mined, and the rules and regulations to be prescribed by the Secretary of the Interior, and preference shall be given to such parties in renewals of such leases : *And provided further*, That when, under the customs and laws heretofore existing and prevailing in the Indian Territory, leases have been made of different groups or parcels of oil, coal, asphalt, or other mineral deposits, and possession has been taken thereunder and improvements made for the development of such oil, coal, asphalt, or other mineral deposits, by lessees or their assigns, which have resulted in the production of oil, coal, asphalt, or other mineral in commercial quantities by such lessees or their assigns, then such parties in possession shall be given preference in the making of new leases, in compliance with the directions of the Secretary of the Interior ; and in making new leases due consideration shall be made for the improvements of such lessees, and in all cases of the leasing or renewal of leases of oil, coal, asphalt, and other mineral deposits preference shall be given to parties in possession who have made improvements. The rate of royalty to be paid by all lessees shall be fixed by the Secretary of the Interior."

Section 16 contains a provision as to the payment and distribution of rents and royalties due said tribes, as follows :

" That it shall be unlawful for any person, after the passage of this act, except as hereinafter provided, to claim, demand, or receive, for his own use or for the use of any one else, any royalty on oil, coal, asphalt, or other mineral, or on any timber or lumber, or any other kind of property whatsoever, or any rents on any

lands or property belonging to any one of said tribes or nations in said Territory, or for any one to pay to any individual any such royalty or rents or any consideration therefor whatsoever: and all royalties and rents hereafter payable to the tribe shall be paid, under such rules and regulations as may be prescribed by the Secretary of the Interior, into the Treasury of the United States to the credit of the tribe to which they belong."

As the acts done and contemplated to be done by the appellee and assailed by the bill of complaint, are presumably not the subject of criticism, in the event that the act of June 28, 1898, was a constitutional and valid exercise of power by Congress, we will now address ourselves to a consideration of that statute.

Prior to the act of March 3, 1871, 16 Stat. 544, 566, now section 2079 of the Revised Statutes, which statute, in effect, voiced the intention of Congress thereafter to make the Indian tribes amenable directly to the power and authority of the laws of the United States by the immediate exercise of its legislative power over them, the customary mode of dealing with the Indian tribes was by treaty. As however held in *Cherokee Nation* v. *Southern Kansas Railway Co.*, 135 U. S. 641, 653, reaffirmed in *Stephens* v. *Cherokee Nation*, 174 U. S. 445, 484, while the Cherokee Nation and other Indian tribes domiciled within the United States had been recognized by the United States as separate communities, and engagements entered into with them by means of formal treaties, they were yet regarded as in a condition of pupilage or dependency, and subject to the paramount authority of the United States.

Reviewing decisions of this court rendered prior to the act of 1871, and particularly considering the status of the very tribe of Indians affected by the present litigation, the court commented upon a declaration made in a previous decision that this government had "admitted, by the most solemn sanction, the existence of the Indians as a separate and distinct people, and as being invested with rights which constitute them a state, or separate community." It was observed of this declaration that it fell "far short of saying that they are a sovereign state, with no superior within the limits of its territory." Considering the treaty of 1835 with the Cherokee Nation, under which it is now

claimed, on behalf of the appellants, that the Cherokees became vested with the sole control over the lands ceded to them, the court observed (p. 484):

 " By the treaty of New Echota, 1835, the United States covenanted and agreed that the lands ceded to the Cherokee Nation should at no future time, without their consent, be included within the territorial limits or jurisdiction of any State or Territory, and that the government would secure to that nation 'the right by their national councils to make and carry into effect all such laws as they may deem necessary for the government of the persons and property within their own country, belonging to their people or such persons as have connected themselves with them;' and, by the treaties of Washington, 1846 and 1866, the United States guaranteed to the Cherokees the title and possession of their lands, and jurisdiction over their country. Revision of Indian Treaties, pp. 65, 79, 85. But neither these nor any previous treaties evinced any intention, upon the part of the government, to discharge them from their condition of pupilage or dependency, and constitute them a separate, independent, sovereign people, with no superior within its limits."

It results then from the doctrine of the decisions of this court that the demurrer was properly sustained, because of the fact that the matters named in the bill were matters of administration, to which the act of June 28 was applicable, and they were solely cognizable by the executive department of the government. The decision in *Stephens* v. *Cherokee Nation,* 174 U. S. 445, is particularly in point, as that case involved the validity of the very act under consideration, and the precedent correlative legislation, wherein the United States practically assumed the full control over the Cherokees as well as the other nations constituting the five civilized tribes, and took upon itself the determination of membership in the tribes for the purpose of adjusting their rights in the tribal property. The plenary power of control by Congress over the Indian tribes and its undoubted power to legislate, as it had done through the act of 1898, directly for the protection of the tribal property, was in that case reaffirmed. Thus, in the course of its opinion,

after alluding to the legislation concerning the Dawes Commission, the court said :

"It may be remarked that the legislation seems to recognize, especially the act of June 28, 1898, a distinction between admission to citizenship merely and the distribution of property to be subsequently made, as if there might be circumstances under which the right to a share in the latter would not necessarily follow from the concession of the former. But in any aspect, we are of opinion that the constitutionality of these acts in respect of the determination of citizenship cannot be successfully assailed on the ground of the impairment or destruction of vested rights. The lands and moneys of these tribes are public lands and public moneys, and are not held in individual ownership, and the assertion by any particular applicant that his right therein is so vested as to preclude inquiry into his status involves a contradiction in terms."

The holding that Congress had power to provide a method for determining membership in the five civilized tribes, and for ascertaining the citizenship thereof preliminary to a division of the property of the tribe among its members, necessarily involved the further holding that Congress was vested with authority to adopt measures to make the tribal property productive, and secure therefrom an income for the benefit of the tribe.

Whatever title the Indians have is in the tribe, and not in the individuals, although held by the tribe for the common use and equal benefit of all the members. *The Cherokee Trust Funds,* 117 U. S. 288, 308. The manner in which this land is held is described in *Cherokee Nation* v. *Journeycake,* 155 U. S. 196, 207, where this court, referring to the treaties and the patent mentioned in the bill of complaint herein, said: "Under these treaties, and in December, 1838, a patent was issued to the Cherokees for these lands. By that patent, whatever of title was conveyed was conveyed to the Cherokees as a nation, and no title was vested in severalty in the Cherokees, or any of them."

There is no question involved in this case as to the taking of property ; the authority which it is proposed to exercise, by virtue of the act of 1898, has relation merely to the control and

development of the tribal property, which still remains subject to the administrative control of the government, even though the members of the tribe have been invested with the status of citizenship under recent legislation.

We are not concerned in this case with the question whether the act of June 28, 1898, and the proposed action thereunder, which is complained of, is or is not wise, and calculated to operate beneficially to the interests of the Cherokees. The power existing in Congress to administer upon and guard the tribal property, and the power being political and administrative in its nature, the manner of its exercise is a question within the province of the legislative branch to determine, and is not one for the courts.

*Affirmed.*