# NAGANAB v. HITCHCOCK.

EQUITY PLEADING; STATUTES; STATUTORY CONSTRUCTION; INDIANS; TRIBAL PROPERTY; INJUNCTION.

1. While a demurrer to a bill in equity admits all facts set forth in the bill which are well and sufficiently pleaded, allegations of the bill as to the construction of statutes or documentary exhibits to the bill are not admitted by the demurrer to be correctly alleged, but are matter of law for the determination of the court.

2. Where an act of Congress is attacked as unconstitutional, and it is sought to enjoin the executive officers of the government from administering it, every possible presumption is in favor of the validity of the statute, and this continues until the contrary is shown beyond a rational doubt.

3. The Indians are wards of the nation, and the authority to deal with lands set aside for them is vested in Congress. In whatever way such lands may be dealt with by Congress, so long, certainly, as the proceeds derived from them are set aside for the Indian beneficiaries, it is not open for the courts to interfere with congressional action, even though it may be thought that some other disposition of the lands would be more beneficial.

4. A decree sustaining a demurrer to and dismissing a bill in equity by the chief of a tribe of Indians against the Secretary of the Interior to declare unconstitutional and void, and to enjoin the Secretary from carrying out, certain provisions of the act of Congress of June 27, 1902, creating a forestry reserve and restricting the cutting of timber upon such reserve in alleged contravention of the rights of the Indians under the act of Congress of January 14, 1889,—*affirmed* on the ground that the former act only dealt with the method of treating the lands, which, together with all avails therefrom, remain the property of the Indians, and that the power of Congress to deal with the tribal property was political and administrative.

No. 1465.  Submitted February 15, 1905.  Decided March 14, 1905.

HEARING on an appeal by the complainants from a decree of the Supreme Court of the District of Columbia sustaining a demurrer to and dismissing a bill to enjoin the Secretary of the Interior from carrying out certain provisions of the act of Congress of June 27, 1902, relating to the lands of the Chippewa Indians, and for other purposes.          *Affirmed.*

The COURT in the opinion stated the case as follows:

This appeal was taken from a decree in equity, wherein the court below, after hearing the case upon the bill of complaint and demurrer thereto, refused to enjoin the appellee, the Secretary of the Interior, from carrying out certain provisions of the act of Congress of June 27, 1902, entitled, "An Act to Amend an Act Entitled an Act for the Relief and Civilization of the Chippewa Indians in the State of Minnesota," and also refusing to require the appellee to complete the execution of an alleged trust and make an account thereunder, as set forth in an act of Congress approved January 14, 1889, entitled "An Act for the Relief and Civilization of the Chippewa Indians in the State of Minnesota."

The facts material to a decision herein, as they appear by the bill and the voluminous exhibits referred to in or made a part of the bill, are substantially these:

Appellant, Joseph Naganab, a chief of one of the bands or

tribes of Chippewa Indians, being a citizen of the United States, brings the suit for his own benefit and for that of all other members of the tribes or bands of the Chippewas. No express authority to act for parties other than himself is shown by the bill. The ground of the suit is the claimed unconstitutionality of the act of June 27, 1902.

The Chippewa Indians at one time claimed a right to a large section of country under what has been termed the "ordinary Indian right," and defined to be simply the right of occupancy, the fee remaining in the United States. The complainant and the band of Indians to which he belongs resided in the State of Minnesota, and kept up and maintained their tribal and band relations as Indian bands and tribes, and occupied certain lands and reservations in the State at the time of the passage of the act of Congress of January 14, 1889. Negotiations with the Chippewa Indians under said act resulted in the acceptance and ratification of said act by the Chippewa Indians, and their cession and relinquishment and conveyance to the United States of all their right, title, and interest in the reservation mentioned in said act. Copies of the agreement relating to said conveyances are made a part of the bill. It was provided by the act of 1889 that, to complete the extinguishment of the right and title of the said bands and tribes to the said lands, that the conveyances thereof should be approved by the President of the United States. In due time, and after due consideration, the President approved the agreements, and notified the Senate and House of Representatives of such approval, as shown by a copy of his message, which is made a part of the bill. By these acts the Chippewa Indians conveyed to the United States of America their right to upwards of 3,555,771 acres, constituting the various reservations. These lands so conveyed were held by the United States in trust for the purpose and upon the conditions stated and expressed in said act. Pursuant to the provisions of the act, the Secretary of the Interior proceeded to examine and classify the lands and approximately 1,500,000 acres thereof were classified as pine lands, and 1,855,000 acres were classified as agricultural lands; 600,000 acres of land

classified as pine lands were situated in the section known as the reservations of the Chippewas of the Mississippi, Leech Lake, Cass Lake, and Lake Winibigoshish. Upon the last-mentioned land there was standing and growing a large amount of merchantable pine timber, alleged to be of the value of $10,-000,000. The land classified as agricultural land, which was to be sold at $1.25 per acre, was valued at $2,318,750.

The terms and conditions of the trust which complainant insists the Chippewa Indians have the right to have completely executed arise out of the provisions of the act, which provides, among other things, for the sale of certain of the lands and payment into the Treasury of the United States of the proceeds thereof. The sums so received, to draw interest at the rate of 5 per cent per annum payable annually for fifty years, and the interest moneys, were to be expended for the benefit of all the Chippewa Indians in the State of Minnesota, as set forth in the act. At the expiration of the fifty years the principal sum, less any amount advanced for the purpose of promoting civilization and self-support among said Indians, was to be paid to them.

It is further alleged that when the act of Congress of June 27, 1902, became a law the trust was only partially executed, as only part of the agricultural and pine lands had been disposed of under the act of January 14, 1889, there remaining undisposed of some 600,000 acres of pine land and some 200,000 acres of agricultural land, the latter being alleged to be worth $1.25 an acre. The bill further alleges that without the consent of the Chippewa Indians of Minnesota, or any of them, and in derogation of their rights and in contravention of the terms of the trust, the act of 1902 in question was passed; and it provided, among other things, for the setting aside of a part of the pine lands then unsold as a perpetual forest reserve, and for restricting the sale of the remaining timber on the reservations, so as to make the same of no value to the Indians; that the value of the lands already actually set aside or authorized to be set aside by the Secretary of the Interior as a perpetual forest reserve are of the value of at least $3,000,000; that the Secretary of the Interior has prescribed rules and regulations

for the cutting of timber upon many acres of pine land adjoining the portion set aside for a forest reserve, and that the carrying out of said rules and regulations will reduce the salable value of such pine timber more than $1,000,000, which sum will be taken out of the trust fund, and it will be diminished thereby to that extent. It is alleged that the act is in violation of the trust contained in the act of 1889, under which the lands were conveyed to the United States; that the act is in violation of the trust, and in direct conflict and violation of Article 5 of the Constitution of the United States in that it deprives the complainant and each and all of the Chippewa Indians of the State of Minnesota of their property without compensation and without due process of law; and the said last-mentioned act is unconstitutional and absolutely void.

To the bill of complaint the appellee interposed a demurrer setting forth these grounds:

"1. That there is a defect of parties complainant.

"2. That the bill is bad in substance, in that it does not set out any facts sufficient to entitle the complainant or the real party in interest, the Chippewa Indians of Minnesota, to the relief prayed for, or to any relief.

"3. That the court has no jurisdiction over the subject-matter of the suit."

*Mr. Tracy L. Jeffords* for the appellant.

*Mr. Frank L. Campbell,* Assistant Attorney General, and *Mr. William C. Pollock,* Assistant Attorney, for the appellee.

Mr. Justice DUELL delivered the opinion of the Court:

Admitting all the facts set forth in the complaint, which are well and sufficiently pleaded, to be true, and remembering that any allegations as to the construction of the statutes or documentary exhibits referred to therein are not admitted by the demurrer to be correctly alleged, being a matter of law for the determination of the court, we are called upon to examine the

case as presented by the pleadings, and see whether anything is presented that differentiates this from other similar cases that have heretofore been decided adversely to the contentions of the appellant.

We are met at the very outset by authoritative decisions of the court of last resort laying down a general rule by which the courts are to be governed when they are asked to declare an act of Congress unconstitutional and enjoin the executive officers from administering it. As has been said, "every possible presumption is in favor of the validity of the statute, and this continues until the contrary is shown beyond a rational doubt." *Sinking Fund Cases,* 99 U. S. 700, 25 L. ed. 496; *Fletcher* v. *Peck,* 6 Cranch, 87, 3 L. ed. 162.

In the class of cases to which the case at bar belongs we have to bear in mind that it has been most conclusively settled that the government dealings with the Indians are in their nature political, and that there is consequently little or no room left for the interposition of the courts. We cannot presume that the legislative department of the government acted in bad faith in enacting the act of June 27, 1902, or that either Congress or the President exercised anything but their best judgment in providing for a forestry reserve, and placing limitations upon the cutting of timber upon the pine lands in question,—in short, that the act of June 27, 1902, was for the benefit of the Indians, bearing in mind the long term referred to in the act of 1889. But however this may be, we fail to discover anything which takes this case out of the general rule laid down in prior decisions of the Supreme Court. *Lone Wolf* v. *Hitchcock,* 187 U. S. 553, 47 L. ed. 299, 23 Sup. Ct. Rep. 216, and *Cherokee Nation* v. *Hitchcock,* 187 U. S. 294, 47 L. ed. 183, 23 Sup. Ct. Rep. 115. In the former case the complainants, claiming due authorization from their tribe, sought to enjoin the defendant, as Secretary of the Interior, from carrying out an alleged unconstitutional act of Congress, the claim of unconstitutionality being that the Indians were deprived of valuable property rights without their consent and to their great injury. The claims

are analogous to those made in this proceeding. The court there said:

"Indeed, the controversy which this case presents is concluded by the decision in *Cherokee Nation* v. *Hitchcock,* 187 U. S. 294, 47 L. ed. 183, 23 Sup. Ct. Rep. 115, decided at this term, where it was held that full administrative power was possessed by Congress over Indian tribal property. In effect, the action of Congress now complained of was but an exercise of such power, a mere change in the form of investment of Indian tribal property, the property of those who, as we have held, were in substantial effect the wards of the government. We must presume that Congress acted in perfect good faith in the dealings with the Indians of which complaint is made, and that the legislative branch of the government exercised its best judgment in the premises. In any event, as Congress possessed full power in the matter, the judiciary cannot question or inquire into the motives which prompted the enactment of this legislation. If injury was occasioned, which we do not wish to be understood as implying, by the use made by Congress of its power, relief must be sought by an appeal to that body for redress, and not to the courts. The legislation in question was constitutional, and the demurrer to the bill was therefore rightly sustained."

It having been repeatedly held that the Indians are wards of the nation, the authority to deal with property set aside for them by agreement with them, or otherwise, is vested in Congress; and this authority, having been so frequently recognized by the Supreme Court, is no longer open for discussion.

In whatever way the lands in question may be dealt with by Congress, so long, certainly, as the proceeds derived from them are set aside for the Indian beneficiaries, it is not open for the courts to interfere with congressional action, even though it may be thought that some other disposition of the lands would be more beneficial. We fail to see how any property is taken from the Indians by the act of June 27, 1902. The act only deals with the method of treating the lands, which, together with all avails therefrom, remain the property of the Indians.

Even though it be held that the withholding of a portion of the lands from sale be considered a taking from the Indians of property set aside for their benefit by the act of 1889, Congress has often exercised such authority, and the courts have recognized the right of the government so to do. *Missouri, K. & T. R. Co.* v. *Roberts,* 152 U. S. 114, 38 L. ed. 377, 14 Sup. Ct. Rep. 496; *Spalding* v. *Chandler,* 160 U. S. 394, 40 L. ed. 469, 16 Sup. Ct. Rep. 360; *The Cherokee Tobacco (207 Half Pound Papers Smoking Tobacco* v. *United States)* 11 Wall. 616, 20 L. ed. 227.

The existence of power in Congress to deal with tribal property having been so frequently recognized by the courts, for the reason that the power is political and administrative, it would be a work of supererogation to amplify by argument or citation of authorities our reasons for believing that the second ground of demurrer is well taken. Nor do we deem it necessary to pass upon either of the other grounds of demurrer.

It follows that the action of the court below in dismissing the bill was correct, and its decree is therefore affirmed, with costs.                    *Affirmed.*

An appeal to the Supreme Court of the United States was prayed by the appellant, and allowed April 4, 1905.