UNITED STATES v. MOORE.

(Circuit Court, E. D. Washington, E. D. March 23, 1907.)

INDIANS—RESERVATION TREATY—CONSTRUCTION—INDIAN LANDS—TITLE.

Indian agreement 1883 between the United States and Chiefs Moses and Sar-sarp-kin, of the Columbia reservation, and Tonasket and Lot, of the Colville reservation, provided for the removal of the tribes to the Colville reservation at their election, for their surrender of a large quantity of reservation lands, and for the allotment in severalty of one square mile of land to each head of a family or male adult, "in the possession or ownership of which they shall be guarantied and protected." This agreement was ratified by act Cong. July 4, 1884 (23 Stat. 79, c. 180), providing that, in case the Indians elect to remain on the Columbia reservation, the Secretary of the Interior shall cause the quantity of land stipulated in the agreement to be allowed them; the same, when selected, "to be held for the exclusive use and occupation" of such Indians, and the remainder of the reservation to be restored to the public domain. *Held*, that land allotted to such Indians in severalty vested in them in fee, as distinguished from a mere right of possession.

A. G. Avery, U. S. Atty., and Joseph B. Lindsley, Asst. U. S. Atty.
E. K. Pendergast and R. W. Starr, for defendant.

WHITSON, District Judge. This is an action for possession of certain real property described in the complaint, together with $2,000 damages for withholding possession, and $2,000 for the rents, issues, and profits. The discussion on demurrer to the complaint has taken a wider range than the facts disclosed by the pleading justify, but counsel have, by oral arguments and written briefs, submitted the whole matter for decision in its broadest scope, and it will be considered accordingly.

The controversy arises over the construction of a certain agreement made between the Secretary of the Interior and the Commissioner of Indian Affairs, and Chiefs Moses and Sar-sarp-kin, of the Columbia reservation, at a conference held in 1883, at which were also present Tonasket and Lot, presumably chiefs of the Colville reservation. The following is a copy of the agreement:

"In the conference with Chiefs Moses and Sar-sarp-kin, of the Columbia reservation, and Tonasket and Lot, of the Colville reservation, had this day, the following was substantially what was asked for by the Indians: Tonasket asked for a saw and grist mill, a boarding school to be established at Bonaparte creek to accommodate one hundred pupils (100), and a physician to reside with them, and $100 (one hundred) to himself each year. Sar-sarp-kin asked to be allowed to remain on the Columbia reservation with his people, where they now live, and to be protected in their rights as settlers, and in addition to the ground they now have under cultivation within the limit of the fifteen-mile strip cut off from the northern portion of the Columbia reservation, to be allowed to select enough more unoccupied land in severalty to make a total to Sar-sarp-kin of four square miles, being 2,560 acres of land, and each head of a family or male adult one square mile, or to remove on to the Colville reservation, if they so desire, and in case they so remove, and relinquish all their claims to the Columbia reservation, he is to receive one hundred (100) head of cows for himself and people, and such farming implements as may be necessary. All of which the Secretary agrees they should have, and that he will ask Congress to make an appropriation to enable him to perform. The Secretary also agrees to ask Congress to make

an appropriation to enable him to purchase for Chief Moses a sufficient number of cows to furnish each one of his band with two cows; also to give Moses one thousand dollars ($1,000) for the purpose of erecting a dwelling house for himself; also to construct a sawmill and gristmill as soon as the same shall be required for use; also that each head of a family or each male adult person shall be furnished with one wagon, one double set of harness, one grain cradle, one plow, one harrow, one scythe, one hoe, and such other agricultural implements as may be necessary. And on condition that Chief Moses and his people keep this agreement faithfully, he is to be paid in cash, in addition to all of the above, one thousand dollars ($1,000) per annum during his life. All this on condition that Chief Moses shall remove to the Colville reservation, and relinquish all claim upon the government for any land situate elsewhere. Further, that the government will secure to Chief Moses and his people, as well as to all other Indians who may go on to the Colville reservation, and engage in farming, equal rights and protection alike with all other Indians now on the Colville reservation, and will afford him any assistance necessary to enable him to carry out the terms of this agreement on the part of himself and his people. That until he and his people are located permanently on the Colville reservation, his status shall remain as now, and the police over his people shall be vested in the military, and all money or articles to be furnished him and his people shall be sent to some point in the locality of his people, there to be distributed as provided. All other Indians now living on the Columbia reservation shall be entitled to 640 acres, or one square mile of land, to each head of family or male adult, in the possession and ownership of which they shall be guarantied and protected. Or should they move on to the Colville reservation within two years, they will be provided with such farming implements as may be required, provided they surrender all rights to the Columbia reservation. All of the foregoing is upon the condition that Congress will make an appropriation of funds necessary to accomplish the foregoing, and confirm this agreement, and also with the understanding that Chief Moses or any of the Indians heretofore mentioned shall not be required to remove to the Colville reservation until Congress does make such appropriation, etc.

"H. M. Teller,
"Secretary of the Interior.
"H. Price,
"Commissioner of Indian Affairs.
"Moses (his X mark).
"Sar-sarp-kin (his X mark)."

This agreement was ratified by act of Congress approved July 4, 188 (23 Stat. 79, c. 180) The rights granted under the agreement and the extent of the ratification are the vital questions over which the litigants are contending. It is alleged in the complaint that the land therein described by metes and bounds, and designated as "Allotment No. 7," was set aside by the President, in pursuance of said act, as an individual reservation; but it is not disputed that the plaintiff must rest a recovery upon the construction of both the agreement and the statute.

It is well settled that Congress may pass the title to public lands by enactment of a statute, and it has been repeatedly held that such a method is quite as effective to divest the government of its title as the issuance of a patent. New York Indians v. United States, 170 U. S. 17, 18 Sup. Ct. 531, 42 L. Ed. 927, and cases there cited. So it has been held by the Supreme Court that a fee-simple title may pass by virtue of a treaty with the Indians without the aid of an act of Congress or patent from the United States. Holden v. Joy, 84 U. S. 211, 21 L. Ed. 523; Jones v. Meehan, 175 U. S. 1–10, 20 Sup. Ct. 1, 44 L. Ed. 49, and cases there cited. The latest reaffirmance

of the doctrine is found in Francis v. Francis, 203 U. S. 233, 27 Sup. Ct. 129, 51 L. Ed. 165.

Another principle equally well settled is that, where the language of a treaty with the Indians is susceptible of more than one construction, it is to be construed in the sense in which they would naturally have understood it. Not that the language can be given a greater effect than the words can be fairly held to imply, but that such interpretation is to be given, considering the situation of the Indians, the subject-matter with which the parties were dealing, and the purposes in view, as will effectuate what was in their minds when the treaty was entered into. Jones v. Meehan, supra. It is not to be overlooked that the Indians, notwithstanding the fact that their contention in that regard has never been sustained, have always claimed, while being gradually but surely borne down by the resistless march of civilization, to be the primary owners of the soil. The pitiful story of what they regard as their subjugation, attributable to their want of adaptation and defiance of our progress as a nation, may be referred to for the purpose of throwing light upon their understanding of the agreement. While they have been overwhelmingly defeated in that contention, and have been compelled to surrender, they have never abandoned their claim, but have always regarded themselves as a people despoiled of their rightful inheritance. They have ever maintained that the whole of the territory of the United States justly belongs to them. If they have apparently acquiesced in a different theory, it is not that they have changed their views, but because they have been perforce compelled to do so. To their traditions, to their claim of ownership, to the Indian understanding of the subject generally, and to the fact that these Indians in particular were in possession of a large reservation, which they were asked to cede to the government to the extent of their rights therein, we may look for aid in arriving at a conclusion as to what they understood by the use of terms of ambiguous import. The agreement must have been reached through the mediumship of an interpreter, by which means their simple ideas were to be transformed into technical words, and this makes the requirement that the matter be examined with care all the more necessary, that the true meaning be not misunderstood.

It was agreed that Sar-sarp-kin and his people were to be allowed to remain on the Columbia reservation, where they at the time lived, and they were to be protected in their rights as settlers, and, in addition to the ground they already had under cultivation, they were to be allowed to select more unoccupied land in severalty, making a total to Sar-sarp-kin of four square miles, and to each head of a family or male adult one square mile. The agreement seemed to contemplate that Moses and his people would go upon the Colville reservation, but in the event that they did not elect to do so, they were provided for in this language:

"All other Indians now living on the Columbia reservation shall be entitled to 640 acres, or one square mile of land, to each head of a family or male adult, in the possession and ownership of which they shall be guarantied and protected."

It does not appear whether allotment No. 7 is held by one of the Sar-sarp-kin Tribe, or under agreement with the people of Chief Moses. If the allottee belonged to the people of Sar-sarp-kin, "each head of a family or male adult" was to be "allowed" one square mile in severalty. Indians belonging to the Moses Tribe were to be "entitled" to the same amount of land, but the word "severalty," which was used in dealing with the Sar-sarp-kin Tribe, gave way to the words "ownership and possession." It is manifest from a reading of this agreement that the Indians were attempting to make their wants known. If the phraseology is slightly changed, it must be attributed to the difficulty of accurately expressing their demands by interpretation from a very simple language into one so rich in shades of meaning. The intention was to give to each tribe the same rights, and it is clear that the words to express those rights were used indifferently. It is true that the language used in the agreement was not expressed in technical words, such as "there is hereby granted," etc., or the like, but it is difficult to suppose that the Indians had anything else in view other than their acquisition of the absolute title to the lands by them selected. Ownership of land has a broader significance than the mere right of occupancy. Bouvier defines "owner" as follows:

"He who has dominion of a thing, real or personal, corporeal or incorporeal, which he has a right to enjoy and do with as he pleases."

Ownership is defined as.

"The right by which a thing belongs to some one in particular, to the exclusion of all others."

To say that one owns land, and is entitled to possession of it, and yet the nature of the tenure is possession only, is to limit the estate. Ownership of property is understood by the most primitive peoples. It is the first step toward organized society. Self-preservation at once suggests is, and the right to live and the necessity for living from one's own industry perpetuates it. This it must be assumed the Indian tribes understood. Their precarious means of subsistence would have impressed it upon them. To what end were the Indians to surrender their claim to the Columbia reservation? There could be no possible consideration for it if the contention now made should be sustained, for they were relinquishing their right of occupancy to this vast body of land without getting any better right to the 22,000 acres set apart for them; and a contract of this character between private individuals, unless the title to the land reserved should vest, and something more than the mere right of occupancy should be granted, could be set aside for want of consideration. To hold that these lands were to be considered as individual reservations would conflict with the express language of the agreement, as the Indians understood it, and under which they made their relinquishment to the reservation as then constituted, and it would apparently present an anomaly in the history of the dealings of the government with the Indians generally.

The rule that courts will pay due regard to the construction given a treaty or statute by the heads of the departments, invoked here on

behalf of the government, is one which has often been referred to with approval by the Supreme Court, and must have due consideration.

Having found what must have been the` understanding of the Indians, we are now to ascertain the understanding of the other party to the agreement, and this we must deduce from the act of Congress, as well as the action of the officers charged with the supervision of the Indians, as disclosed by the public documents having reference to the matter. Turning first to the statute, it is to be remarked, in view of the provisions of the act of March 3, 1871 (16 Stat. 544, c. 120), now designated as section 2079 of the Revised Statutes, that the agreement depends for its validity upon the act of Congress. Having reference to the agreement, Congress declared its intention as follows: "Which agreement is hereby accepted, ratified, and confirmed, including all expenses incident thereto," etc. We find a provision that Sar-sarp-kin and the Indians then residing on the Columbia reservation should elect within one year from the passage of the act whether to remain on that reservation or remove to the Colville reservation, and touching that portion of the agreement it was expressly provided:

"That in case said Indians so elect to remain on said Columbia reservation, the Secretary of the Interior shall cause the quantity of land therein stipulated to be allowed them to be selected in as compact form as possible; the same, when so selected, to be held for the exclusive use and occupation of said Indians, and the remainder of said reservation to be thereupon restored to the public domain."

A fair application of the rules of statutory construction leads to the conclusion that it was the intention of Congress to ratify the agreement, and that the phraseology of the act, which is somewhat different from that of the agreement, was not intended as an amendment or limitation of it as it had been entered into. The agreement was amended in regard to the time in which they should exercise their option, but the substitution of the phrase "exclusive use and occupation of said Indians" in the act of Congress, instead of "in the possession and ownership of which they shall be guarantied and protected," could not, in the light of the unequivocal and express ratification, have been intended as an amendment.

It seems that the only remarks on the measure when it was up for passage were made by Mr. Brents, delegate from Washington Territory. Among other things, he said: "Good faith and good policy both demand of us that we should keep the agreements with these Indians." To keep the agreement certainly meant something more than taking a tract of agricultural land, amounting to 2,143,040 acres, to which the Indians had the right of occupancy, and giving them a much smaller area of the same country, to be occupied only by them. The contention that they were to occupy individual reservations without title is not in accord with their well-known habits of life and ideas relating to the use of land. On November 6, 1883, the Commissioner of Indian Affairs reported to the Secretary of the Interior (Cong. Rec. vol. 15, p. 2517), in regard to this particular agreement, as follows:

"This agreement, if ratified by Congress, will restore to the public domain some 2,143,040 acres, in addition to the 749,300 acres restored by executive order of February 23, 1883, in case the Indians elect to remove to the Col-

ville reservation, while if they decide to remain, some 22,000 acres only will be required to allot the quantity of land stipulated by the agreement. It is not considered desirable. that this large reservation should be long held for the few Indians who live upon it. It is clear, however, that they are entitled to some compensation for its relinquishment, as it was given them by the officers of the government, in whose assurances they must have had confidence. I have therefore prepared the draught of a bill providing for the ratification of the agreement and the necessary appropriation for carrying it into effect. From the nature of the stipulation, it appears impossible to submit a detailed estimate of the funds required. I have named a sum ($85,000) which it is believed will be sufficient for the purposes required. As the agreement leaves the question of the removal of the Indians to the Colville reservation optional with them, I have inserted a section requiring them to decide within one year from the passage of the bill whether they will remain or move."

The bill submitted by the Commissioner was apparently adopted without amendment. It would be assuming bad faith, duplicity, and fraud on his part, in the light of his report, when he asked to have the agreement ratified, to suppose that he intended to limit the act of ratification in a way to defeat the manifest purposes for which it was made. It cannot be assumed that he intended to perpetrate a fraud upon the Indians. Nor can it be supposed that the Secretary of the Interior would give his countenance to that which could be only designated as a trick, a scheme, or a device for misleading them in order to secure a surrender of their claim to so large a body of land. On the contrary, the record discloses the utmost good faith on the part of those officers. To "allot" had come to have a technical meaning. When the Commissioner used that word, it must be concluded that he was familiar with what it implied. That Congress so understood it is further shown by a letter from General Miles, which was read when the bill was under consideration, as the following quotation will show:

"By the terms of this agreement, the Indians surrender the valuable and extensive reservation, comprising 2,649,600 acres of territory (except what land the few families remaining take in severalty), in consideration of the government giving them protection on the Colville reservation and the means of making themselves self-supporting."

He further said:

"This is a case where the government has the opportunity, and by fair dealing and proper consideration for the interests of the Indians can, for a very moderate consideration, locate a very large number of Indians in severalty or by families, and put them in a way to make themselves self-supporting, and to become a productive, prosperous people."

That letter concluded as follows:

"I earnestly recommend that the terms be faithfully complied with on the part of the government." Cong. Rec. Aug. 15, p. 2571.

And thus Congress had before it the construction, not only of the military officers officially cognizant of the matter, but of those who brought about the agreement.

In the light of this history of the measure, to hold with the contention that Congress intended to modify the agreement with the Indians, except in so far as to fix a time in which they were required to make their election, would be to accuse it of a deliberate and willful fraud—

a thought, of course, not to be harbored for a moment—and, even if it could be supposed that such a thing were possible, that construction which is consistent with good faith must necessarily be adopted, if the expression of the legislative will is sufficiently manifest to justify it.

In Long Jim v. Robinson et al., 16 Land Dec. Dep. Int. 15, the Secretary of the Interior, in sustaining the rights of these Indians, used the language which follows:

"That said Indian applicants are entitled to have allotments of land made to them in severalty in quantities and manner provided in the agreement of July 7, 1883, and that the right of said several white claimants above named to the land claimed by them is subordinate and subject to the prior and superior right of said Indians. I can see no legal reason as between them (referring to the Indians) and the United States for the government withholding from them the full benefits it agreed to bestow upon them."

As illustrative of the views entertained by the Commissioner of Indian Affairs, on January 5, 1900, he wrote to the honorable Secretary, contending that Congress had no power to amend a treaty or agreement made with the Indians without their consent. He said in part:

"It is certainly a novel proposition in law that one party to an agreement may, without the consent of the other, alter or modify an essential part of such contract. It is apparent that no court of law would uphold or enforce any contract so altered or amended. In all our dealings with the Indian tribes I do not find that any agreement has ever been amended by Congress without providing for the assent of the Indians interested. In one or possibly two cases Congress has entirely ignored an agreement for the cession of lands upon the grounds that the Indians, parties thereto, were not the owners of the land ceded; but it has never attempted to write in new and different words in a signed agreement, without providing that the agreement should be open to rejection or adoption by the Indians interested."

Senate Document No. 76, 56 Cong. First Session.

Until April 13, 1905, the matter thus apparently rested without substantial dispute until the acting Commissioner of Indian Affairs wrote to the Secretary of the Interior contending for the view which the government would now uphold; but it may be observed that the contention is not in accord with the contemporaneous construction both of the agreement and of the statute. But we cannot wholly rely upon the understanding of the department nor upon the views expressed in Congress when the act was before it, unless the statute is susceptible of an interpretation which is in accord with the manner in which the Indians understood it. That question remains to be examined. For many years prior to 1883 it had been the effort of the government to break up the tribal relations of the Indians, and to secure for them "divided and individual ownership"; and the agitation for the allotment of land in severalty is said to have begun as far back as the days of James Madison. Annual Report of the Secretary of the Interior (Indian Affairs) 1900, p. 660.

It would be unprofitable to enter into a detailed reference to the numerous public documents, reports of the Commissioner of Indian Affairs, superintendents, and Indian agents, all looking to the ultimate breaking up of tribal relations and the conferring of citizenship upon the Indians. An interesting summary of the subject may be found in

the Annual Report of the Secretary of the Interior (Indian Affairs) for 1900, pp. 660, 661, et seq. The agitation finally took definite and practical form by the act of February 8, 1887 (24 Stat. 388, c. 119), which provided for allotments in severalty. Prior to that time there appears to have been no general statute under which the Indians could receive land in that way, except the act of May 20, 1862 (18 Stat. 420, c. 131), conferring the benefit of the homestead law upon native born Indians, which was little availed of; but it had been the constant endeavor of those intrusted with the supervision of the Indians to inculcate in their minds a desire for individual ownership, and for taking land in severalty and assuming the duties of citizenship; and title in severalty, described as allotments, was well understood by the Indians, the Department of the Interior, and, of course, by members of Congress. These particular tracts of land, made certain when selected under the provisions of the law, were designated as allotments, in accordance with the understanding that allotments did represent individual ownership, and this was in consonance with the policy of the officers of the government, who sought to induce the Indians to assume individual responsibility in lieu of their system of tribal ownership. And Congress being advised that the Department of the Interior, through the Secretary and the Commissioner of Indian Affairs, had secured an agreement with these Indians to take lands in severalty, confirmed that action, in the light of which it is not doing violence to the statute to construe it, in connection with the agreement, as meaning that each head of a family or male adult was entitled to one square mile of land in severalty, in the ownership and possession of which he should be guarantied and protected.

It will naturally occur that it has of late years been a well-defined policy to limit the right of alienation, and this ought to have some bearing upon the conclusion to be reached in this case; but such has not been the uniform practice in dealing with the Indians. Many cases construing Indian treaties are referred to in Jones v. Meehan, supra. They present great variety in explaining the purposes of the parties in the many compacts therein reviewed. Those cases cannot be examined here at length, but the proper interpretation of them may best be understood by setting out the conclusion of the Supreme Court in its own language:

"The clear result of this series of decisions is that when the United States, in a treaty with an Indian tribe, and as part of the consideration for the cession by the tribe of a tract of country to the United States, make a reservation to a chief or other member of the tribe of a specified number of sections of land, whether already identified or to be surveyed and located in the future, the treaty itself converts the reserved sections into individual property; the reservation, unless accompanied by words limiting its effect, is equivalent to a present grant of a complete title in fee simple, and that title is alienable by the grantee at his pleasure, unless the United States, by a provision of the treaty or of an act of Congress, has expressly or impliedly prohibited or restricted its alienation."

Cherokee Nation v. Hitchcock, 187 U. S. 294, 23 Sup. Ct. 115, 47 L. Ed. 183, in no way conflicts with the contention of the defendant. The Indians in that case held no titles in severalty. At page 307 of 187 U. S., at page 120 Sup. Ct. (47 L. Ed. 183), it was said:

"Whatever title the Indians have is in the tribe, and not in the individuals, although held by the tribe for the common use and equal benefit of all the members. The Cherokee Trust Funds, 117 U. S. 288–308, 6 Sup. Ct. 718, 29 L. Ed. 880. The manner in which this land is held is described in Cherokee Nation v. Journeycake, 155 U. S. 196–207, 15 Sup. Ct. 55, 39 L. Ed. 120, where this court, referring to the treaties and the patent mentioned in the bill of complaint herein, said: 'Under these treaties, and in December, 1838, a patent was issued to the Cherokees for these lands. By that patent, whatever of title was conveyed was conveyed to the Cherokees as a nation, and no title was vested in severalty in the Cherokees, or any of them.'"

It should be remembered, also, that this agreement antedates the allotment act of 1887, and that prior thereto the policy applicable to community interests of these people had not been fixed in that respect, although in relation to Indian homesteads future action was foreshadowed. Holding, as it must be held, that the fee passed to the Indians upon the location and identification of their allotments, pursuant to the agreement, which was ratified by the act of Congress, and it appearing that no restraint on alienation was made, and assuming that the defendant, as suggested by counsel, holds by conveyance from the heirs of an allottee made prior to the act of March 8, 1906 (Stat. 1905–06, p. 55, c. 629), it results that the government has no interest in the land which it seeks in this action to control.

Upon proper stipulation as to the facts, judgment of dismissal will be entered. Failing in this, the case will take such course, consistent with these views, as will result in a denial of the right to maintain the action. This conclusion has been reached with much reluctance, for no doubt it would be better for the Indians to sustain the plaintiff's contention. They are not qualified to cope with the white race, and the result of this decision, should it be sustained in the higher courts, will no doubt be prejudicial to their best interests. It is to be regretted that so commendable an effort should not have been made before the agreement received the approval of Congress, or at least before the rights of purchasers had attached; but the Supreme Court has said that the courts are not concerned with these considerations. Cherokee Nation v. Hitchcock, 187 U. S. 308, 23 Sup. Ct. 115, 47 L. Ed. 183. Whether the relation of guardian and ward still subsists between the government and the Indians who were parties to the agreement to such an extent as to authorize Congress to limit or control their right of alienation need not be decided. The act of Congress which ratified the agreement did not in terms make them citizens, and until citizenship is conferred it may be that, under the concluding paragraphs of Cherokee Nation v. Hitchcock, supra, and the distinction made in the Matter of Heff, 197 U. S. 490, 25 Sup. Ct. 506, 49 L. Ed. 848, it is competent for Congress to control the making of future conveyances not prohibited by the original act. That question is not here for decision.